STATE of Wisconsin, Plaintiff-Respondent,†

v.

Tyrone BOOKER, Defendant-Appellant.††

Court of Appeals

*No. 2004AP1435–CR. Submitted on briefs May 5, 2005.
—Decided July 26, 2005.*

2005 WI App 182

(Also reported in 704 N.W.2d 336.)

† Petition to review granted 10-14-05.
†† Petition to review denied 10-14-05.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey W. Jenson*, of *Law Offices of Jeffrey W. Jensen*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Sarah K. Larson*, assistant attorney general.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J.   Tyrone Booker appeals the judgment entered following a jury trial, convicting him of two counts of exposing a child to harmful materials and two counts of second-degree sexual assault of a child, contrary to Wis. Stat. §§ 948.11(2)(a) and 948.02(2) (2003–04).[2] Booker first argues that his constitutional right to effective cross-examination was violated when the trial court granted the State's motion *in limine* seeking to prohibit testimony indicating that the vagi-

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

nal swabs and underwear of S.M.R., the fourteen-year-old victim of the sexual assaults, taken the night of the incident, did not contain any of Booker's semen, but did contain the semen of other men. Next, he argues that the trial court erroneously exercised its discretion when it permitted the State, in response to Booker's cross-examination highlighting S.M.R.'s inconsistent statements, to read the entirety of S.M.R.'s initial statement given to the police, to the jury.

¶ 2.  Finally, Booker argues that insufficient evidence was presented to convict him of the exposing a child to harmful materials charges. He reasons that the statute requires the State to prove that harmful material was shown to S.M.R. and her two girlfriends, and the definition of "harmful material" requires that the material be harmful to children. In order for material to be harmful to children, the material must be, according to Wis. Stat. § 948.11(1)(b)2., "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for children," among other things. Once that condition is met, the material must also be viewed to see if it "lacks serious literary, artistic, political, scientific or educational value for children." Inasmuch as the jury never viewed the tape, and the only testimony indicating that the tape shown by Booker was "harmful material" consisted of a general description of the videotape by the girls and a police detective's account of the contents of the videotape, he argues that the State failed in its proof.

¶ 3.  After reviewing the record in this case, we are satisfied that the trial court properly ruled that, under the rape shield law and the holding in *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990), the presence of semen found on the vaginal swabs and S.M.R.'s underwear was not admissible. We are also

753

satisfied that the trial court properly exercised its discretion under the doctrine of completeness when it permitted the State to read S.M.R.'s initial statement given to the police, to the jury. However, we conclude that insufficient evidence was presented to the jury to prove the two counts of exposing a child to harmful materials and, as a result, those convictions must be reversed and the matter remanded to the trial court. The two sexual assault counts are affirmed.

## I. Background.

¶ 4.   According to the criminal complaint and the direct examination testimony of S.M.R., on December 17, 2001, S.M.R., then fourteen years old, was recruited by two friends to skip school. The three got on a city bus and went to an apartment where a boy named "Donta" lived. S.M.R. did not know Donta. He was the boyfriend of one of the other girls. Once at the apartment, Booker, Donta's mother's boyfriend, who lived with the family, admitted the girls to the apartment. Although Donta was not home, the girls remained in the apartment.

¶ 5.   Some time later, Booker asked them if they knew that Donta had a video camera in his room and that he had taped the two girls accompanying S.M.R. when they had recently visited. The girls were surprised that Donta had a video camera, and wanted to see the tape. Booker then walked into another room and returned with a videotape entitled "Robert." Shortly thereafter, he retrieved a VCR and played the tape. S.M.R. testified that when Booker would fast-forward the video, she saw images of adult men and women, both naked and in various stages of dress, engaged in sexual acts.

¶ 6.   Shortly thereafter, the phone rang several times, and after the second call, Booker told the girls

they had to walk to the day care with him to retrieve a little boy because the boy had been "acting up." On the way back to the apartment, Booker threatened to spank the boy with a large stick that he picked up on the walk. The little boy was crying and the girls implored Booker not to spank him. Booker said he would not spank the child if one of the girls would dance for him. S.M.R. agreed to dance, and once in the apartment, Booker turned on some music and she began dancing. Several minutes later, Donta arrived home and the three girls and Donta went into his bedroom. After a brief passage of time, Booker came into the bedroom, saying the girls had to leave because S.M.R. had not finished dancing. S.M.R. then proceeded to dance again for Booker, and then returned to the bedroom. Booker again entered the bedroom, holding the telephone and demanding that the girls leave, stating that Donta's mother had said that they had to go. After speaking with Booker, Donta told S.M.R. that the only way that Booker would allow the girls to stay was if S.M.R. would show her "private part" to Booker. S.M.R. acquiesced and removed all her clothes except her bra, and laid down on a bed. She and Booker were the only ones in the room, as Donta and the girls had gone into the living room. Once on the bed, Booker laid down next to her and placed his thumb and mouth on her vagina.

¶ 7.  Eventually, the girls left, and S.M.R. went home. S.M.R. did not report the sexual assault. Later that night, her aunt, with whom she lives, received a phone call from Donta's grandmother relating the day's events, including the sexual assault, and called the police. The police came and questioned S.M.R. and then took her to the hospital. There, swabs and other evidence, including some clothes, were taken from S.M.R. The vaginal swabs and S.M.R.'s underwear were later

tested and found to contain semen, the DNA of which belonged to two unidentified men. Booker was eliminated as a possible source of the DNA.

¶ 8. After criminal charges were lodged against Booker, the State filed a motion *in limine* seeking to prohibit the introduction of the test results.[3] The trial court granted the motion, and months later a jury trial was held. At the trial, S.M.R. was extensively cross-examined concerning the inconsistencies in the various statements she gave describing the events that led up to the assault. Afterwards, the State sought and received, over Booker's objection, permission to have S.M.R.'s entire initial statement to the police read to the jury under the rule of completeness.

¶ 9. With respect to the tape, during the trial, the girls were asked questions regarding the tape's contents, and a police detective, a sexual assault investigator, testified that she watched the tape the night before her testimony and described what she saw on the tape to the jury. However, the tape was never viewed by the jury. At the end of the trial, Booker's attorney requested that the jury be allowed to view the tape. The trial court refused this request.

¶ 10. The jury convicted Booker of all four counts. He was sentenced to nine years of confinement, followed by six years of extended supervision, for each count of second-degree sexual assault, to be served concurrently, and to one year of confinement, followed by a one-year period of extended supervision for each of the counts of exposing a child to harmful material, to be

---

[3] Booker was originally charged with one count of second-degree sexual assault. After Booker pled "not guilty," the State amended the information to include another count of second-degree sexual assault and two counts of exposing a child to harmful material.

served concurrently to one another and consecutive to the two counts of sexual assault. This appeal follows.

## II. ANALYSIS.

A. *The trial court properly exercised its discretion in denying Booker's motion to admit evidence of semen found on S.M.R.'s vaginal swabs and underwear.*

¶ 11.   Booker submits that his constitutional right to effective cross-examination was violated when the trial court refused to permit the introduction of evidence of the semen from other men found on S.M.R.'s vaginal swabs and on her underwear. Booker contends that, in so ruling, the trial court improperly applied both the rape shield law found in WIS. STAT. § 972.11(2) and the holding in *Pulizzano*, 155 Wis. 2d 633.

¶ 12.   At trial, Booker's defense was that S.M.R.'s report of a sexual assault was a fabrication concocted in retribution for an argument Booker had with his girlfriend's son, Donta. Booker claims that by not revealing that she had sexual intercourse with other men, S.M.R. gave an incomplete or possibly fabricated statement concerning the assault by Booker. Thus, he argues he was entitled to present this evidence under the totality of the circumstances. We disagree.

■

¶ 13.   Evidentiary rulings are discretionary, and therefore we review them under an erroneous exercise of discretion standard. *State v. Hammer*, 2000 WI 92, ¶ 43, 236 Wis. 2d 686, 613 N.W.2d 629. When evidentiary rulings implicate a defendant's confrontation and compulsory process rights, however, we review those rulings without deference to the circuit court. *Id.* For purposes of reviewing a question of constitutional fact,

we adopt the circuit court's findings of fact unless clearly erroneous, but independently apply those facts to the constitutional standard. *See State v. McMorris,* 213 Wis. 2d 156, 165–66, 570 N.W.2d 384 (1997).

¶ 14.   The right to present a defense through the testimony of favorable witnesses and the effective cross-examination of adverse witnesses is grounded in the Confrontation and Compulsory Process Clauses of the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution. *See Pulizzano,* 155 Wis. 2d at 645–46. The primary objective of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by rigorously testing it in an adversarial proceeding before a jury or trier of fact. *Maryland v. Craig,* 497 U.S. 836, 845 (1990). To accomplish this objective, the defendant must have the opportunity to meaningfully cross-examine witnesses. *See State v. Thomas,* 144 Wis. 2d 876, 893, 425 N.W.2d 641 (1988). The right to present a defense is not absolute, but rather is limited to the presentation of relevant evidence whose probative value is not substantially outweighed by its potential prejudicial effect. *See Pulizzano,* 155 Wis. 2d at 646. A defendant's right to present a defense may in some cases require the admission of testimony that would otherwise be excluded under applicable evidentiary rules. *See id.* at 648.

¶ 15.   One such limitation on the admission of evidence is found in the rape shield law codified in Wis. Stat. § 972.11(2). Wisconsin's rape shield law was enacted in part to counteract outdated beliefs that a complainant's sexual past would shed light on the truthfulness of the sexual assault allegations. *Michael*

758

*R.B. v. State*, 175 Wis. 2d 713, 727, 499 N.W.2d 641 (1993). WISCONSIN STAT. § 972.11(2) provides, in relevant part:

**972.11 Evidence and practice; civil rules applicable.** . . .

**(2)** (a) In this subsection, "sexual conduct" means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life–style.

(b) If the defendant is accused of a crime under s. 940.225, 948.02, 948.025, 948.05, 948.06 or 948.095, any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to s. 971.31 (11):

1. Evidence of the complaining witness's past conduct with the defendant.

2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

(c) Notwithstanding s. 901.06, the limitation on the admission of evidence of or reference to the prior sexual conduct of the complaining witness in par. (b) applies

regardless of the purpose of the admission or reference unless the admission is expressly permitted under par. (b) 1., 2. or 3.

¶ 16.   The trial court ruled that the rape shield law prohibited the introduction of the semen evidence:

> Now should the defendant be allowed statutorily to put in this evidence under 972.11 sub (2) sub (b) 2.[?] Statutorily the defense may not. That exception says evidence of specific instances of sexual conduct showing the source or origin of semen is admissible for use in determining the degree of sexual assault or the extent of injury suffered.

> Clearly, the presence of semen is evidence of some specific instances of sexual conduct, and since there is DNA testing that shows it's someone else, it does show the source or origin of semen. But the statute doesn't end there. It has to be admissible for use in determining the degree of sexual assault or the extent of injury suffered, and it doesn't do that in this particular case. Therefore, 972.11 sub (2) sub (b) 2 is not applicable.

We agree. The statute lists three types of evidence that are exceptions to the rape shield law:   (1) evidence of the complainant's past conduct with the defendant; (2) evidence of specific instances of sexual conduct used to show the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered; and (3) evidence of prior untruthful allegations of sexual assault made by the complainant. WIS. STAT. § 972.11(2)(b). The evidence that Booker sought to introduce does not fall within any of the exceptions.

¶ 17.   We next analyze the evidence in light of the judicial exception to the rape shield law first codified in

*Pulizzano*. In order to balance the interests of the defendant and the complainant, our supreme court has developed a narrow test to determine when a defendant's right to present a defense should supersede the State's interest in protecting the complainant from prejudice and irrelevant inquiries. In *Pulizzano*, the supreme court held that evidence of a child complainant's past sexual behavior may supersede the rape shield law prohibition if it meets a five-part test. *Pulizzano*, 155 Wis. 2d at 651–52. To meet the *Pulizzano* test, the defendant must show that the proffered evidence meets these five criteria: (1) the prior acts must have clearly occurred; (2) the prior acts must closely resemble those of the present case; (3) the prior acts must be clearly relevant to a material issue; (4) the evidence must be necessary to the defendant's case; and (5) the probative value of the evidence must outweigh its prejudicial effect. *Id.* at 651. If the five prongs are met, the court must then balance the parties' interests to determine if the evidence is admissible. *Id.* at 653–55.

¶ 18. The trial court, in a thoughtful decision, went through the five-part *Pulizzano* test and concluded that the five factors were not present here:

> Now when I apply the Pulizzano test to the evidence in this case and I look at the prior acts, the prior acts clearly occurred. The presence of semen in the trace evidence shows that there was some prior sexual contact from someone who used his penis with respect to the child. So clearly the prior acts occurred.

> Second, the prior acts are clearly relevant to a material issue to this extent, the child having experienced sexual contact in the past would give the child some knowledge regarding sexual activity that other children may not have.

761

Is the evidence necessary to the defendant's case? The defense I know believes it is. I'm not sure that it is, but I'm willing to concede that the defense believes it's necessary to their case in terms of alternate source of knowledge.

Fifth, the probative value must outweigh the prejudicial effect.

And of course the second test is the prior acts closely resemble the allegations here.

I believe that the defense fails with respect to the second factor and the fifth factor. The second factor is do the prior acts closely resemble the allegations here? They do not. Clearly, the prior sexual contact with this child involved penile contact. The allegations here are mouth to vagina, finger to vagina. There is no allegation of penis to vagina. The acts in the prior case in no manner, shape, or form, come close to resembling what occurred allegedly with respect to Mr. Booker's case.

We agree with the trial court and adopt its analysis. Booker has failed to satisfy all five of the *Pulizzano* factors. The prior acts do not closely resemble the allegations in this case. Here, S.M.R. claimed Booker sexually assaulted her by touching her—she never claimed that Booker had sexual intercourse with her. Whether S.M.R. engaged in sexual intercourse with other men does not impact her complaint that Booker sexually assaulted her. His claim that S.M.R. is lying and conspiring with Donta to harm Booker is pure speculation. The girls, Donta and Booker's girlfriend, all testified that the girls were at the apartment. The three girls and Donta all testified consistently about the events that led to the assault. S.M.R. discussed the assault while still at the apartment and never reported the assault until her aunt was notified. There is little, if

any, evidence supporting Booker's conspiracy theory. While it is clear that Donta and his mother's boyfriend had a strained relationship, there is no evidence to suggest that Donta and the three girls conjured up the sexual assault to harm Booker. Thus, because there was no hard evidence of improper motive for the accusation, the semen evidence was rightfully ruled inadmissible.

B. *The trial court properly exercised its discretion in permitting the introduction of S.M.R.'s initial statement to the police.*

¶ 19.    Booker argues that the trial court's decision, allowing S.M.R.'s entire statement, taken shortly after the police were contacted, to be read to the jury, "left the jury with the false impression that the statement to police was not inconsistent on any major point," when she "left out of her statement to police the fact that she had sexual intercourse with a male other than Booker."

¶ 20.    We first note that Booker argues a fact not in evidence. While it would appear, given the scientific evidence, that S.M.R. had had sexual intercourse, nothing in the record supports Booker's presumption that this act or these acts occurred contemporaneously with or after the assault in question. No scientific evidence was presented discussing the length of time that sperm can be observed in a vaginal swab or in underwear. It is entirely possible that any sexual conduct that S.M.R. may have had predated the sexual contact she experienced with Booker. Thus, Booker's argument that S.M.R. must have left something out of her statement is meritless. Booker is merely speculating that the sexual intercourse, if indeed that is what took place, occurred contemporaneously with or after the assault.

¶ 21.  Moreover, the trial court's ruling, which allowed the State to read S.M.R.'s entire first statement given to the police, to the jury, following Booker's attorney's cross-examination of her on the inconsistencies in her later statements, was a proper exercise of discretion. In *State v. Eugenio*, 210 Wis. 2d 347, 565 N.W.2d 798 (Ct. App. 1997), this court approved a similar discretionary determination.

¶ 22.  In that case, Eugenio, also charged with sexual assault of a child, complained that the trial court improperly applied the "doctrine of completeness." "This doctrine enables an opposing party to introduce a whole document or an out-of-court statement or recording when the other party offers just an excerpt. The rule is premised on a concern that part of a statement may not give the factfinder the 'total picture.' " *Id.* at 360 (citations omitted); *see* Wis. Stat. § 901.07.

¶ 23.  After a cross-examination of the victim in *Eugenio,* during which Eugenio focused on the inconsistencies between her testimony and her earlier out-of-court statements, the State moved to have its other witnesses testify regarding the consistencies in the victim's previous interviews and her testimony. *Id.* at 360–61. The trial court, citing the "doctrine of completeness," granted the State's request. Eugenio claimed on appeal that " 'simply using a portion of the victim's prior statements to demonstrate an inconsistency does not open up the remainder of her out-of-court statement for admission into evidence.' " *Id.* at 361. Further, he cited another case that warned that the doctrine should not create a "Trojan Horse" that opens the trial to all the remaining out-of-court statements. *Id.* at 361–62.

¶ 24.  Noting that the additional information does not come in automatically, and is admissible only when

the party seeking its admission shows that the whole out-of-court statement is necessary to give the fact-finder the full picture of what happened, this court found that introduction was a proper exercise of discretion and observed that the "Trojan Horse" warning retained its vitality in other settings. *See id.* at 362.

¶ 25. Here, as in *Eugenio*, the defense essentially argued that the victim "engaged in a systematic pattern of lying about the events." *Id.* at 363 (footnote omitted). This is a "sufficient reason" to permit the State to introduce other portions of the victim's previous statements to rebut that theory. *See id.* Thus, we are satisfied that the underpinnings for the doctrine of completeness were established and the trial court properly exercised its discretion in permitting the State to introduce the evidence.

C. *Insufficient evidence was submitted to permit the jury to evaluate the video to determine whether it was harmful to children.*

¶ 26. Booker argues that the evidence adduced at his trial was insufficient, as a matter of law, to prove that the videotape entitled "Robert" was harmful to children. Booker submits that "harmful material," as defined in WIS. STAT. § 948.11(1)(ar), must be "harmful to children," and material is not harmful to children unless, among other things, it "[i]s patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for children." Consequently Booker argues that: "[W]hether the material is 'harmful' requires the application of a community standard which necessarily implicates the sensibilities of the jury who are, if nothing else, arbiters of commu-

nity values (together they are the 'average persons' of the community)." Booker goes on to argue:

> ... [W]hether an act, such as a sex act, has any artistic value depends entirely upon the context in which it is presented—that is, the statute requires that the material be "taken as a whole." ... Where, as here, the entire context is not given to the jury and, rather, isolated images are described, it is impossible to conclude that the tape has no artistic value.

¶ 27. The State maintains that the jury could convict Booker on the state of this record because sufficient circumstantial evidence existed to permit the jury to conclude that "the video appealed to the prurient interest of children, was patently offensive with respect to what was suitable for children of any age, and lacked serious artistic or educational value for children when taken as a whole." Additionally, the State cites *State v. Trochinski*, 2002 WI 56, 253 Wis. 2d 38, 644 N.W.2d 891, as support for its position. We are not persuaded by the State's arguments.

¶ 28. A well-known standard explains:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (citations omitted).

¶ 29.   This case presents an issue unlike ordinary challenges to the sufficiency of evidence. Here, the question revolves around whether sufficient evidence was introduced to permit *any* reasonable jury to find that the video viewed by the girls fell within the ambit of Wis. Stat. § 948.11, which provides, in pertinent part:

**Exposing a child to harmful material or harmful descriptions or narrations. (1)** DEFINITIONS. In this section:

(ag) "Harmful description or narrative account" means any explicit and detailed description or narrative account of sexual excitement, sexually explicit conduct, sado- masochistic abuse, physical torture or brutality that, taken as a whole, is harmful to children.

(ar) *"Harmful material" means:*

1. Any . . . *motion picture film* . . . that depicts nudity, sexually explicit conduct, sadomasochistic abuse, physical torture or brutality *and that is harmful to children . . .*

. . . .

(b) *"Harmful to children" means that quality of any* description, narrative account or *representation, in whatever form, of nudity, sexually explicit conduct . . . when it:*

1. *Predominantly appeals to the prurient, shameful or morbid interest of children;*

2. *Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for children; and*

*3. Lacks serious literary, artistic, political, scientific or educational value for children, when taken as a whole.*

(Emphasis added.)

¶ 30.    The history behind the statute and its wording can be found in *State v. Kevin L.C.*, 216 Wis. 2d 166, 576 N.W.2d 62 (Ct. App. 1997). In *Kevin L.C.*, this court explained:

> A law which prohibits a person from exhibiting to children materials determined to be obscene to children, though not obscene to adults is called a "variable obscenity statute." A state may constitutionally enact such a statute. [The Wisconsin Legislature created a variable obscenity statute when it passed WIS. STAT. § 948.11.] The Wisconsin Supreme Court has held that § 948.11, STATS., is not unconstitutionally overbroad. In [*State v.*] *Thiel*, [183 Wis. 2d 505, 515 N.W.2d 347 (1994),] the court concluded that the legislature had properly adopted the test in *Miller v. California*, 413 U.S. 15 (1973), to determine what materials are harmful to minors without unduly burdening the First Amendment rights of adults to view, sell or examine materials society does not consider obscene for them.

216 Wis. 2d at 185 (citations omitted).

¶ 31.    In *Thiel*, finding WIS. STAT. § 948.11 constitutional, our supreme court examined the tension between the guaranteed rights protected by the First Amendment and laws prohibiting the display of material unsuitable for children, which were designed to protect children and preserve the rights of parents to supervise the development of their children. *See* 183 Wis. 2d at 524. The supreme court opined:

> In his attack on sec. 948.11, Stats., Thiel joins the ongoing debate which has involved other variable obscenity statutes:   how to resolve the competing social

values of safeguarding " 'the physical and psychological well-being of a minor' " without unduly burdening the individual first amendment rights of adults in a " 'real and substantial fashion.' "

*Thiel*, 183 Wis. 2d at 524 (footnotes omitted). Thus, the supreme court found that WIS. STAT. § 948.11 was properly drafted with these ideals in mind.

¶ 32. Here, as noted, the jury did not view the video. The only testimony concerning the contents of the video entitled "Robert," besides the descriptions given by the girls, was that of a police detective. She did not testify as an expert on prevailing community standards and the record does not suggest that she was qualified to do so. Thus, the question comes down to whether any reasonable jury, having never viewed the video, can analyze the tape under the statute's requirements and convict an accused on the basis of this record. We think not.

¶ 33. The jury heard evidence concerning the video from four witnesses—the three juveniles who viewed the tape, and a police detective, assigned to sexual assault cases, who viewed the entire tape for the first time the night before she testified. The prosecution asked S.M.R. to state what she saw, and she described several different scenes with different actors and actresses engaged in sex acts.

¶ 34. Sabrina B.'s testimony concerning the video related that older men and younger women were engaged in the act of fellatio. Deana's testimony regarding the video was even more brief:

Q. What did it show?

A. It was a porno video.

Q. How much of it did you watch?

769

A. Like five minutes of it.

Thus, it is clear that the tape depicted nudity and sexually explicit conduct. What remains unanswered, however, is whether the tape was "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for children." Even assuming that sufficient circumstantial evidence exists to find that the tape was patently offensive to prevailing standards in the adult community, taken as a whole, with respect to what is suitable for children, we are left to wonder whether the tape lacked any literary, artistic, political, scientific or educational value. Indeed, the detective was competent to testify only to what actions took place on the video. Furthermore, no expert witness was called to assist the jury concerning the prevailing standards in Wisconsin in the adult community over what is appropriate material for viewing by children, or whether the tape fell outside the statute because it contained serious artistic, political, scientific or educational value for children. The only testimony presented to the jury was a description of intermittent sex acts. Had the statute required only a finding that the tape contained offensive sexually explicit conduct, then perhaps the evidence would have been sufficient. However, given the wording of the statute and its serious interplay with First Amendment rights, we conclude that the jury was unable to analyze the tape under the required tests set forth in the statute, and thus, insufficient evidence was presented to convict Booker on those charges.

¶ 35. Finally, we conclude the State's reliance on *Trochinski* is misplaced. Trochinski attempted to withdraw his no contest plea to one count of exposing a minor to harmful materials based upon his allegation

that he did not understand the meaning of "harmful to children" found in Wis. Stat. § 948.11(2). *See Trochinski*, 253 Wis. 2d 38, ¶ 1. The opinion contains the supreme court's assessment of the material after the court examined it. In explaining why the dissent was wrong in its contentions, the majority wrote.

> We further disagree with the dissent's conclusion that the nude photographs are not "harmful material" and therefore do not supply a factual basis for the offense charged. Dissent at ¶ 62. The dissent concludes that the photos of the defendant standing naked in front of a curtain, displaying a non-erect penis[,] do not satisfy the three-part variable obscenity test in Wis. Stat. § 948.11(1)(b). By applying contemporary community standards, we conclude that the nude photos appeal to the prurient interest of children, *see* § 948.11(1)(b)1., and are patently offensive with respect to what is suitable for children, *see* § 948.11(1)(b)2. Further, we conclude that the nude photos "lack[] serious literary, artistic, political, scientific or educational value for children, when taken as a whole." *See* § 948.11(1)(b)3. A reasonable minor of like age of [the victim], seventeen, would not find literary, artistic, political, scientific, or educational value in the photos. *See State v. Thiel*, 183 Wis. 2d 505, 536, 515 N.W.2d 847 (1994). We, therefore, conclude, as the circuit court did impliedly, that the nude photographs are harmful material, and that there was a sufficient basis to support Trochinski's plea.

*Trochinski*, 253 Wis. 2d 38, ¶ 32.

¶ 36.   While the supreme court elected to apply the three-part variable obscenity test to the photos and concluded that the trial court impliedly found the photos to be harmful material, the court did so after, presumably, viewing the photos. The fact that the supreme court found that naked pictures shown to a

seventeen-year-old met the three-part variable obscenity test does not lead to the conclusion that all nudity or sexually explicit conduct shown to children less than seventeen years of age meets the standard. The statute requires material to be individually analyzed under the three-part test. Here, the jury was left to speculate how the actions were portrayed in their entirety and in what context they were shown.

¶ 37.   Moreover, in *Trochinski,* the supreme court was primarily concerned with the legal requirements needed to withdraw a plea of no contest. Less information is required to validate a factual basis for a plea. "[A] judge may establish the factual basis as he or she sees fit, as long as the judge guarantees that the defendant is aware of the elements of the crime, and the defendant's conduct meets those elements." *State v. Thomas,* 2000 WI 13, ¶ 22, 232 Wis. 2d 714, 605 N.W.2d 836. In evaluating the material in the context of a request to withdraw a plea, the supreme court was not establishing the amount of evidence needed for a conviction in a trial setting.

¶ 38.   While we are not so naïve as to believe the tape was beneficial to the girls, given the constitutional rights in play and the explicit wording of the statute, we cannot conclude that a reasonable jury could make the finding it did on the state of this record.

¶ 39.   Thus, we are satisfied that in order to determine whether the material is harmful to children, the factfinder should ordinarily evaluate the content of the material and determine first-hand whether it is patently offensive, given the prevailing standards in the adult community, as a whole, with respect to what is suitable for children. Next, the jury must evaluate the material to see, when taken as a whole, whether it

"[l]acks serious literary, artistic, political, scientific or educational value for children" when taken as a whole, given the victim's age. Because we conclude that insufficient evidence was presented to the jury to prove the two counts of exposing a child to harmful materials, the trial court's judgment is reversed and the matter is remanded. The two sexual assault counts are affirmed.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.