STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Tyrone BOOKER, Defendant-Appellant.

Supreme Court

*No. 2004AP1435–CR. Oral argument February 23, 2006.
—Decided June 29, 2006.*

2006 WI 79

(Also reported in 717 N.W.2d 676.)

43

ABRAHAMSON, C.J., concurs.

For the plaintiff-respondent-petitioner the cause was argued by *Sarah K. Larson,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-appellant there was a brief by *Jeffrey W. Jensen* and *Jeffrey W. Jensen Law Office,* Milwaukee, and oral argument by *Jeffrey W. Jensen.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. The State of Wisconsin challenges the court of appeals decision reversing the conviction of Tyrone Booker (Booker) on two counts of exposing a child to harmful materials, contrary to Wis. Stat. § 948.11 (2003–04).[1] The court of appeals concluded that the evidence was not sufficient to sustain the jury's verdict because the jury did not view the video alleged to be "harmful material," but instead heard only the children's and a detective's descriptions of what they saw. We conclude that the testimony that depicted the content of the

---

[1] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

video scenes shown to the children was sufficient to support the jury's verdict that Booker violated § 948.11 by exposing children to harmful material. Accordingly, we reverse the decision of the court of appeals in that regard.

## I. BACKGROUND

¶ 2.　The relevant facts are undisputed. On December 17, 2001, Shequila and her two friends, Sabrina and Deana, skipped school and went to visit Deana's boyfriend, Donta, at his home. At the time, Shequila was 14, and Sabrina and Deana were 12 and 13, respectively. When they arrived at Donta's apartment, Booker, Donta's mother's boyfriend, let them into the apartment. Deana asked Booker where Donta was and he told her Donta had left but would return soon. The girls sat down in the living room. Booker then told them that on a previous night, when Deana and Sabrina had visited the apartment, he had taped them on video without their knowing it. He said he would show them the tape. He brought a VCR and a video cassette labeled "Robert" from a bedroom to the living room.

¶ 3.　The "Robert" video Booker showed the girls was a pornographic video of naked women and men engaging in various sexual acts. According to the girls' testimony at trial, Booker fast-forwarded through the video, stopping to show various scenes depicting naked women performing fellatio on naked men. One of the girls asked Booker to stop playing the video, and he did.

¶ 4.　The girls later explained that parts of the video they saw showed scenes of women performing fellatio on men, a scene of a man dressed as a security guard receiving fellatio from several women dressed as cheerleaders and a scene of a man and a woman having penis-to-vagina intercourse.

46

¶ 5. Shortly after showing the girls these parts of the videotape, Booker got a phone call from Donta's brother's daycare. He told the girls they had to go with him to pick up Donta's brother because he could not leave them at home alone. The girls went on foot with Booker. After retrieving the little boy from daycare, on the way home, Booker picked up a tree branch and told the girls that he would whip the little boy with it unless one of the girls danced for him when they returned to the apartment. Amongst themselves, the girls protested that they did not want to be the one to do it, but after the little boy started crying, Shequila said she would dance. When they arrived back at the house, Booker put on music and told Shequila to dance. Shequila began to dance to the music, and soon after, Donta arrived.

¶ 6. The three girls went with Donta into his bedroom. Booker came to the bedroom door and said to send Shequila back out, because she was not finished dancing. Shequila obliged, and then returned to the bedroom. Booker again returned to the bedroom, this time threatening to call the girls' parents or the police to tell them that the girls were skipping school if the girls did not leave. He said he wanted one of the girls to go alone in a room with him, and if someone did it, the girls would not get in trouble. Shequila agreed to do it so that the girls would not get into trouble, but told him he could not touch her.

¶ 7. When Booker and Shequila were in the bedroom alone, he asked her if she "was ready" and reminded her that he was going to call "the people" to tell them that she had skipped school if she did not cooperate. He asked her if she was going to take off her clothes. Shequila obliged and stripped down to her bra. He told her to lie down, and then he pushed her legs open and

47

proceeded to assault her by probing her vaginal area with his thumb and mouth.

¶ 8. At trial, Shequila, Sabrina, and Deana all testified about the contents of the video that Booker showed them. The investigating detective, who had viewed the entire video, also described it in detail. The witnesses consistently described the video as consisting of multiple episodes, all of which focused on various sexual acts, as the following excerpts from Shequila's and the testifying detective's testimonies illustrate. Shequila testified as follows:

Q: What did you see?

Shequila: A woman with a man's penis in her mouth.

Q: The woman— Describe the scene you saw. You saw a penis in her mouth; is that right?

Shequila: Yes.

Q: Anybody wearing any type of clothing?

Shequila: No.

Q: In that scene nobody was wearing anything?

Shequila: They had took it off.

Q: So the woman is naked?

Shequila: Yes.

Q: And the man is naked?

Shequila: Yes.

Q: So you see that image on this TV screen; is that right?

Shequila: Yes.

Q: And describe what happens then?

Shequila: He stopped it, and he fast-forwarded it to another part.

Q: And then what happened?

Shequila: It was a part with the security guard on it.

Q: Pardon?

Shequila: It showed a part with a security guard.

Q: And what did you see happening with the security guard?

Shequila: A woman.

Q: And what did you see happening with the woman?

Shequila: She put his penis in her mouth.

Q: And the woman, what was she dressed like, or did she have any clothes on?

Shequila: Like cheerleaders.

Q: When you say "like cheerleaders," do you mean like a cheerleading outfit?

Shequila: Yes.

Q: When you say "the woman," did the person, the females depicted, did they look—

 . . .

Shequila: Like in their twenties.

 . . .

Q: What else happened with that tape; what else did you see?

49

Shequila: He stopped it and fast-forwarded it to an-
other part.

Q: Describe what you saw then?

Shequila: It was another cheerleader. It was just one,
and it was a dude in his bedroom.

Q: And what did you see happen in that scene?

Shequila: They took they [sic] clothes off, and she
start— she had his penis in her mouth.

Q: What else did you see happen, if anything?

Shequila: He kept stopping it and fast-forwarding it
to certain kinds of parts.

Q: Did you ever hear any dialogue in this film?

Shequila: Yes.

Q: Like what did you hear?

Shequila: Like moaning sounds and stuff.

. . .

Q: Did you ever hear people having a conversation?

Shequila: Yes.

Q: Like what were they saying?

Shequila: I don't remember.

Q: You don't remember?

Shequila: No.

Q: To the best of your memory, did it seem like a
conversation about sex?

Shequila: Yes.

The detective then testified:

Q: Let me ask you this, how does the videotape begin?

Detective: The videotape right from the start depicts a male and a female engaged in sexual intercourse.

Q: What type of sexual intercourse?

Detective: Oral sex.

Q: Meaning what?

Detective: Penis to— Penis to mouth intercourse.

Q: Did you watch the entire tape?

Detective: Yes.

Q: How many different scenes— Let me rephrase that. How many different episodes are on the— that videotape?

Detective: There are fourteen separate episodes on this tape.

Q: And by episodes, what differentiates one episode from another?

Detective: Sexual interaction with different individuals. Each episode contained different individuals. Each episode is not repeated acts.

Q: With respect to the first episode, you watched it all?

Detective: Yes.

Q: What does it show?

Detective: It shows naked males and a naked female, and there's finger to vagina fondling. There's penis to mouth sexual intercourse.

51

There is penis to vagina intercourse. There is finger to anis [sic] fondling, and there is the male masturbating himself to the point of ejaculation on the female.

Q: That's the first episode?

Detective: Yes.

Q: You watched fourteen other episodes?

Detective: Yes.

Q: Are they all essentially the same except involving different people?

Detective: Yes.

Q: Describe what type of people are— what type, if any, clothing was on any of the people during any of these episodes.

Detective: Yes. The first episode was a male and a female. After that there were variations on a cheerleader theme. There's cheerleader auditions, and there was also a couple episodes involving a security guard, a female dressed as a cheerleader.

Q: And in the episodes, for example, involving the cheerleader, what would happen?

Detective: There was very little dialogue, but she would be asked to start dancing, remove her clothes. At which time the male would begin to interact sexually with her.

Q: How would each episode end?

Detective: With the male masturbating himself to the point of ejaculation on the female.

¶ 9. The video was entered into evidence but was never played for the jury. Booker never challenged the circuit court's decision to present evidence to the jury

through the testimonies of the victim-witnesses and the detective who viewed the tape.[2]

¶ 10. The jury convicted Booker of two counts of second-degree sexual assault and two counts of exposing a child to harmful materials. Booker appealed, asserting that there was insufficient evidence to convict him under Wis. Stat. § 948.11, of exposing a child to harmful materials.[3] He alleged that because the statute required the jury to find that the video is patently offensive and has no artistic value when taken as a whole, a jury must actually view the video before it could find that the elements of the crime were proved.

¶ 11. The court of appeals agreed with Booker's reasoning, concluding that there was insufficient evidence to support the findings of guilt for exposing a child to harmful materials. *State v. Booker*, 2005 WI App 182, ¶ 34, 286 Wis. 2d 747, 704 N.W.2d 336. It acknowledged that the girls' and the detective's testimonies at trial made it clear that the tape depicted nudity and sexually explicit conduct. *Id.* However, notwithstanding that, the court of appeals concluded that what remained unanswered by the evidence presented was: (1) whether "the tape was patently offensive to prevail-

[2] Wisconsin Stat. § 910.02 was mentioned in oral argument, although it is not referenced in either party's briefs. It provides:

> To prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in chs. 901 to 911, s. 137.21, or by other statute.

We were provided with no argument or citation to authority in regard to its application. Therefore, we do not address § 910.02 further.

[3] Booker's convictions of second-degree sexual assault are not before us on this review.

ing standards in the adult community, taken as a whole, with respect to what is suitable for children"; and (2) "whether the tape lacked any literary, artistic, political, scientific or educational value" for children. *Id.* The decision suggested that because "no expert witness was called to assist the jury" in analyzing "the prevailing standards in Wisconsin" regarding appropriate viewing material for children or whether it "contained serious artistic, political, scientific or educational value for children," the jury was unable to analyze the tape according to the statute's required tests. *Id.* Consequently, it concluded that insufficient evidence had been presented to find Booker guilty of exposing children to harmful materials, and it reversed those convictions. *Id.* We review that portion of the court of appeals decision.

## II. DISCUSSION

A. Standard of Review

¶ 12. Our review requires us to apply Wisconsin statutes and to review whether evidence presented to a jury was sufficient to support the jury's verdict. Application of a statute to facts is a question of law, subject to our independent review. *Tahtinen v. MSI Ins. Co.,* 122 Wis. 2d 158, 166, 361 N.W.2d 673 (1985). We also review as a question of law whether the evidence presented to a jury is sufficient to sustain its verdict. *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

B. Wisconsin Stat. § 948.11

¶ 13. Booker was convicted of violating Wis. Stat. § 948.11(2)[4] because of the video he showed to the girls. We begin our discussion by reviewing the definitions set

---

[4] Wisconsin Stat. § 948.11(2)(a) provides in relevant part:

54

out in § 948.11(1).[5] There is a difference between § 948.11 and the "obscene material or performance" statute, Wis. Stat. § 944.21.[6] While some of the lan-

Whoever, with knowledge of the character and content of the material, sells, rents, exhibits, plays, distributes, or loans to a child any harmful material, with or without monetary consideration, is guilty of a Class I felony if any of the following applies:

1. The person knows or reasonably should know that the child has not attained the age of 18 years.

2. The person has face-to-face contact with the child before or during the sale, rental, exhibit, playing, distribution, or loan.

[5] Wisconsin Stat. § 948.11 states, in pertinent part:

**Exposing a child to harmful material or harmful descriptions or narrations.** (1) DEFINITIONS. In this section:

. . .

(ar) "Harmful material" means:

(1) Any picture, photograph, drawing, sculpture, motion picture film or similar visual representation or image of a person or portion of the human body that depicts nudity, sexually explicit conduct, sadomasochistic abuse, physical torture or brutality and that is harmful to children; or

. . .

(b) "Harmful to children" means that quality of any description, narrative account or representation, in whatever form, of nudity, sexually explicit conduct, sexual excitement, sadomasochistic abuse, physical torture or brutality, when it:

1. Predominantly appeals to the prurient, shameful or morbid interest of children;

2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for children; and

3. Lacks serious literary, artistic, political, scientific or educational value for children, when taken as a whole.

[6] Wisconsin Stat. § 944.21 states, in pertinent part:

55

guage in the two statutes is similar, distinctions are central to our analysis in this case.

¶ 14. Both statutes require the fact-finder to determine (1) if the material is offensive as compared with community standards and (2) whether the material has literary, artistic, political, educational or scientific value. However, an important distinction is that Wis. Stat. § 948.11 specifies that these considerations relate to whether the material offends community standards regarding what is appropriate *for children* or whether the material has value *for children*.

¶ 15. We discussed the difference between Wis. Stat. § 948.11 and general obscenity statutes in *State v. Thiel,* 183 Wis. 2d 505, 515 N.W.2d 847 (1994). In *Thiel,* the defendant was convicted of exhibiting harmful material to a child and, among other arguments, con-

---

**Obscene material or performance.** (1) The legislature intends that the authority to prosecute violations of this section shall be used primarily to combat the obscenity industry and shall never be used for harassment or censorship purposes against materials or performances having serious artistic, literary, political, educational or scientific value. The legislature further intends that the enforcement of this section shall be consistent with the first amendment to the U.S. constitution, article I, section 3, of the Wisconsin constitution and the compelling state interest in protecting the free flow of ideas.

. . .

(c) "Obscene material" means a writing, picture, film, or other recording that:

1. The average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole;

2. Under contemporary community standards, describes or shows sexual conduct in a patently offensive way; and

3. Lacks serious literary, artistic, political, educational or scientific value, if taken as a whole.

tended that § 948.11 was overly broad in violation of the First Amendment. *Id.* at 515. The defendant argued that the statute had the "effect of criminally punishing those who exhibit, sell, or view material" protected by the First Amendment. *Id.* at 520. We rejected that argument for the following reasons: (1) the overbreadth doctrine is inapplicable when a limiting construction will maintain the legislation's constitutional integrity (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973)); (2) the statute is rationally related to the compelling state interest of protecting the well-being of children; and (3) the overbreadth doctrine is employed only as a last resort (citing *New York v. Ferber,* 458 U.S. 747, 769 (1982)). *Thiel,* 183 Wis. 2d at 521.

¶ 16. In the course of our analysis, wherein we concluded that Wis. Stat. § 948.11 was not overly broad, we discussed the statute's history, purpose, classification, relationship to general obscenity statutes and statutory counterparts in other jurisdictions. *Id.* at 523–36. We noted that many states had enacted laws banning or restricting the flow of obscene materials to minors and that laws prohibiting a person from exposing children to materials deemed "obscene to children" are "variable obscenity statutes." *Id.* at 523–24. We noted the legitimate purpose, as recognized by the United States Supreme Court, of variable obscenity statutes: "to protect the physical and psychological well-being of children . . . and to protect them from obscenity." *Id.* (citing *Ferber,* 458 U.S. at 756–57). As has been done in other states, the Wisconsin legislature created § 948.11 by appropriately adopting the obscenity test of *Miller v. California,* 413 U.S. 15 (1973), to create a variable obscenity statute. *Thiel,* 183 Wis. 2d at 535. We also established that § 948.11 has a dual purpose: "(1) to protect minors from material harmful

to them as a class and (2) to protect the rights of parents to supervise the development of their children." *Id.* at 524 (citations omitted).

¶ 17. The import of this analysis for our purposes in the immediate case is the clear distinction *Thiel* makes between the statutory elements of harm and value of particular materials in regard to *children* in a variable obscenity statute when compared with elements of harm and value of material to which the general obscenity statutes are applied. We explained how to apply Wis. Stat. § 948.11, with regard to the three factors necessary to prove materials are "harmful to children." That test, as opposed to the test that is used in the general obscenity statute, analyzes a material's value or harmfulness in regard to the minor or minors exposed to it:

> Distinct from those cases involving the commercial display of materials to a general, consumer audience, the language of sec. 948.11 focuses upon the affirmative conduct of an individual toward a specific minor or minors. Therefore, an individual violates the statute if he or she, aware of the nature of the material, knowingly offers or presents for inspection to a specific minor or minors material defined as harmful to children in sec. 948.11(1)(b).

> In sec. 948.11(1)(b), Stats., the legislature adapted the *Miller* test of obscenity to produce a definition of what may be considered harmful to children. The first two prongs of the test—appeal to prurient interest and patent offensiveness—are analyzed by applying contemporary community standards. However, the third prong requires a separate analysis: does the material have literary, artistic, political, or scientific value? The appropriate standard at this point is "whether a reasonable person would find such value in the material,

> taken as a whole." Therefore, the appropriate standard to apply under this statute is whether material defined as harmful has any serious literary, artistic, political, scientific, or educational value, when taken as a whole. Such value is assessed by a *reasonable minor of like age to the minor to whom the material is exhibited.*

*Id.* at 535–36 (citations omitted; emphasis in original).

■

¶ 18. The question Booker presents is whether the evidence presented sufficiently fulfills the test set out in *Thiel* such that a reasonable jury could find beyond a reasonable doubt that the video was "harmful material" as defined in Wis. Stat. § 948.11. Under *Thiel,* a jury is required to consider contemporary community standards regarding what appeals to the prurient interests of children and whether material is patently offensive to the adult community's standards of what is appropriate for children. *Id.* at 535. The jury also had to consider whether the material had some other serious value for children, in this case for 12– to 14–year-old children. *Id.* at 535–36. With the statute's requirements and *Thiel's* guiding principles for applying them in mind, we move on to Booker's challenge to the sufficiency of the evidence presented to the jury.

C. Sufficiency of the Evidence

1. Parties' arguments

¶ 19. Although it was entered into evidence, the video was not shown to the jury. Booker argues that this omission is dispositive because there is no satisfactory substitute for having the jury view the video when it is deciding whether it is "harmful material" that is "harmful to children." He contends that the jury could not determine whether the video is "patently offensive to

prevailing standards in the adult community as a whole with respect to what is suitable for children" and whether the video "lacks serious literary, artistic, political, scientific or educational value for children, when taken as a whole" without actually viewing the parts of the video that allegedly constitute the "harmful material." He argues that descriptions of isolated images and sexual acts from the video are not sufficient to prove the three factors necessary to make the required finding under Wis. Stat. § 948.11.

¶ 20. In contrast, the State argues that the plain language of the statute does not require that the State prove those factors with direct evidence, i.e., by actually showing the video to the jury. It also contends that, as this court discussed in *Thiel, see id.* at 535,[7] Wis. Stat. § 948.11 focuses on the nature of the materials, which need not be ascertained through direct viewing by the fact-finder, but may also be ascertained from others' descriptions of the materials.

¶ 21. The State also asserts that the "harmful material" element of Wis. Stat. § 948.11, i.e., that the material has no literary, artistic, political, scientific or educational value for children and that the material is "patently offensive to prevailing standards in the adult

---

[7] The language of the statute reflects the state's compelling interest to protect the well-being of its youth by examining the *nature* of the materials. Once the nature of the materials is deemed to be harmful, by application of the *Miller* test, an individual may not—in a pubic or private forum— sell, loan, exhibit, or transfer harmful materials to minors. . . . Therefore, an individual violates the statute if he or she, aware of the nature of the material, knowingly offers or presents for inspection to a specific minor or minors material defined as harmful to children in sec. 948.11(1)(b).

*State v. Thiel,* 183 Wis. 2d 505, 534–35, 515 N.W.2d 847 (1994).

community as a whole with respect to what is suitable for children," can be met by the evidence in this case. It contends that the jury is the appropriate evaluator of whether that element was proved by the evidence presented. Therefore, no expert analysis as to community standards was necessary to prove the material "patently offensive." Finally, the State emphasizes that Booker fast-forwarded through portions of the video to show the girls the scenes depicting fellatio and other sexual acts; therefore, the material to which the girls were exposed was selected specifically for its obscene and inappropriate content. Accordingly, although the testifying detective offered a description of the entire video, the only evidence necessary to sustain a guilty verdict is testimony about the portions of the video actually shown to the girls.

2. Application of the law

¶ 22. Evidence is insufficient to support a conviction only if the evidence, when viewed most favorably to the State, "is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Poellinger,* 153 Wis. 2d at 501. As the court of appeals recently noted in *State v. Searcy,* 2006 WI App 8, 288 Wis. 2d 804, 709 N.W.2d 497, the defendant bears a heavy burden in attempting to convince a reviewing court to set aside a jury's verdict on insufficiency of the evidence grounds. *Id.,* ¶ 22 (citing *State v. Allbaugh,* 148 Wis. 2d 807, 808–09, 436 N.W.2d 898 (Ct. App. 1989)).

¶ 23. In Booker's trial, the girls' and the detective's testimonies regarding the content of the tape were

61

admitted to prove the "harmful material" element of Wis. Stat. § 948.11. All of the witnesses explained that the video's dominant focus was on nudity and explicit sexual acts and suggested that the video had no additional plot line, meaningful dialogue or other notable qualities or characteristics. The girls characterized it as a "porno" video. Their descriptions of what they saw provided the jury with explicit details of the contents of the video that the jury could use to assess the film's appeal to children's prurient interests, its offensiveness to community standards about what is appropriate for children and its lack of other value for 12– to 14–year-olds. The jury was able to make its own decision as to the credibility of the witnesses. *Poellinger,* 153 Wis. 2d at 506.

¶ 24. The United States Supreme Court, federal courts, and Wisconsin courts are uniform in concluding that questions of whether material appeals to prurient interests, satisfies community standards for potentially obscene material or has literary, artistic, political, scientific or educational value may be appropriately decided by a jury. *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56 (1973) (holding in an obscenity case, it was not "error to fail to require 'expert' affirmative evidence that the materials were obscene"); *see also United States v. Wild,* 422 F.2d 34 (2d Cir. 1969) (holding that issues of prurient appeal and offensiveness to contemporary community standards were appropriately decided by a jury, notwithstanding the lack of expert testimony); *State v. Tee & Bee, Inc.,* 229 Wis. 2d 446, 452, 600 N.W.2d 230 (Ct. App. 1999) (citing *Smith v. United States,* 431 U.S. 291, 305 (1977)) (holding in an obscenity case that "contemporary community standards [can] be applied by juries in accordance with their own understanding of the tolerance of the average person in their community".

¶ 25. When we view the evidence in this case most favorably to the State, we conclude that a reasonable "trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt," based on the testimony presented. First, the jury could conclude that the video excerpts, as described, predominantly appeal to the prurient interests of children. "Prurient" is defined as "arousing inordinate or unusual sexual desire." *Black's Law Dictionary* 1263 (8th ed. 2004). The portions of the video that Booker showed to the girls were consistently described as scene upon scene of sexual acts, with all scenes ending with the male masturbating to the point of ejaculation on the female.

¶ 26. Second, the jury could conclude that the video is patently offensive to prevailing standards in the adult community with regard to what is suitable for children. Motion pictures that depict explicit sexual material harmful to minors may not be shown at outdoor theaters if the screen is visible from a public street, sidewalk, thoroughfare or other public place or from private property where it can be observed by minors. Wis. Stat. § 134.46(2). Videos with the type of content described by the witnesses are not available for rental to minor children in Wisconsin. Videos showing explicit sexual acts are commonly rated and restricted so that minor children will not be exposed to them.[8] A jury could make a reasonable determination based on the testimony presented at trial that the video Booker showed the girls is considered by Wisconsin adults as unsuitable for children.

---

[8] *See* Kids in Mind website, http://www.kids-in-mind.com, movie and video ratings in regard to suitability for children with content rated for graphic violence, sex/nudity, and profanity. *Id.* (last visited June 22, 2006).

¶ 27. Third, the jury could conclude that the video excerpts lacked serious literary, artistic, political, scientific or educational value for 12– to 14–year-olds because nothing was shown except episodes with men and women engaging in sexual acts. There was no evidence that the video had merit for children of these ages, for any reason. And, for the same reasons that the other parts of the "harmful material" element can be met by the evidence presented, a reasonable trier of fact could conclude from the testimony that the video was absolutely void of serious literary, artistic, political, scientific or educational value for children.

¶ 28. The parties also discuss *State v. Trochinski,* 2002 WI 56, 253 Wis. 2d 38, 644 N.W.2d 891, but they disagree as to its relevance to the issues presented in this case. *Trochinski* centered on a defendant's no contest plea to one count of exposing a minor to harmful materials in violation of Wis. Stat. § 948.11(2). *Id.,* ¶ 1. "After sentencing, Trochinski filed a postconviction motion seeking to withdraw his plea." *Id.* He alleged that when he pled, he did not understand the "harmful to children" element of the offense. *Id.* He said that his trial counsel did not advise him that the State would have to prove that the photographs he gave to the 17–year-old girl[9] were "patently offensive to prevailing community standards regarding what is suitable" for a child of like age and that the material "lacked serious value when taken as a whole," for a child of like age. *Id.,* ¶ 18. He argued that "because he did not understand how 'harmful to children' would be judged by the jury with respect [to the girl to whom he gave the

_____

[9] Trochinski also gave similar photographs to a 15–year-old girl. That charge was dropped as part of the plea agreement. *State v. Trochinski,* 2002 WI 56, ¶ 7 n.3, 253 Wis. 2d 38, 644 N.W.2d 891.

pictures], he did not understand the meaning of that element when he entered his plea." *Id.*

¶ 29. We concluded that Trochinski had not established prima facie proof that his plea was involuntary or unknowing. *Id.,* ¶ 23. The record revealed that Trochinski gave a minor nude photos of himself, an alleged letter from Playgirl magazine, and a letter to the minor asking her to review his nude photos. We concluded that the circuit court did not err in concluding this constituted a sufficient factual basis to support Trochinski's plea. *Id.,* ¶ 32.

¶ 30. We conclude that the procedural posture of *Trochinski* causes it to have little relevance. We upheld the defendant's plea in *Trochinski.* Trochinski's plea waived the right to have a jury determine whether showing the pictures to a child violated Wis. Stat. § 948.11. Therefore, our discussion in *Trochinski* focused on his knowing and voluntary waiver. Furthermore, although both cases involve the application of § 948.11, *Trochinski* involved a plea, a child of a different age and a few still-life photos, rather than a jury verdict, 12– to 14–year-old children and a video showing actual fellatio, sexual intercourse, masturbation to the point of ejaculation, and sexual fondling of various types.

¶ 31. Accordingly, we conclude that the evidence submitted to the jury was such that a reasonable jury could have found beyond a reasonable doubt that Booker violated Wis. Stat. § 948.11.[10]

## III. CONCLUSION

¶ 32. We conclude that the testimony that depicted the content of the video scenes shown to the

---

[10] This opinion does not address whether the video would contravene the adult obscenity statute, Wis. Stat. § 944.21.

children was sufficient to support the jury's verdict that Booker violated Wis. Stat. § 948.11 by exposing children to harmful material. Accordingly, we reverse the decision of the court of appeals in that regard.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 33. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree that the conviction should be affirmed. I write separately because two subjects raised by the majority opinion require further discussion. First, I discuss *State v. Trochinski,* 2002 WI 56, 253 Wis. 2d 38, 644 N.W.2d 891, and its relevance to the instant case. Second, I discuss the original writing rule.

I

¶ 34. The parties discuss the *Trochinski* case at length and debate its applicability to the case at hand.

¶ 35. In *Trochinski,* this court addressed the defendant's motion to withdraw a no contest plea. A no contest plea is treated for criminal law purposes the same as a guilty plea.

¶ 36. When an accused pleads guilty and admits guilt, the circuit court must determine whether a sufficient factual basis exists for the guilty plea.[1] At a hearing on a motion to withdraw a guilty plea after

---

[1] *State v. Thomas,* 2000 WI 13, ¶ 14, 232 Wis. 2d 714, 605 N.W.2d 836. The purpose of this rule is to make sure that when a defendant is pleading guilty, he understands the charges against him and is not pleading guilty on facts insufficient to support the charges. *White v. State,* 85 Wis. 2d 485, 491, 271 N.W.2d 97 (1978) (quoting *McCarthy v. United States,* 394 U.S. 459, 467 (1969)).

*See also* Wis. Stat. § 971.08(1) (2003–04), which states:

sentencing, an accused has the burden of showing "manifest injustice" by clear and convincing evidence. One of the grounds for finding manifest injustice is that no factual basis for the plea exists. In other words, an accused has the burden to show by clear and convincing evidence that no factual basis exists to support the conclusion that the conduct an accused admits actually falls within the charge. *White v. State,* 85 Wis. 2d 485, 491, 271 N.W.2d 97 (1978).

¶ 37. It is within the discretion of the circuit court to determine whether an accused should be permitted to withdraw a guilty plea.[2] Therefore, an appellate court will reverse a circuit court's denial of an accused's request to withdraw a guilty plea only if the circuit court erroneously exercised its discretion.[3] Upon review of a circuit court's denial of a motion to withdraw a guilty plea, an appellate court is required to determine whether the circuit court's order was based on the facts and on a correct interpretation and application of the law.

¶ 38. Trochinski was charged with showing a set of ten nude photographs of himself to a girl who was 17 years and three months old. In addition, the defendant gave the 17–year-old a questionable copy of a letter from Playgirl indicating that his nude photos would be published, and a letter to the 17–year-old inviting her to

---

(1) Before the court accepts a plea of guilty or no contest, it shall do all of the following:

. . . .

(b) Make such inquiry as satisfies it that the defendant in fact committed the crime charged.

[2] *White,* 85 Wis. 2d at 491.

[3] *Id.; Hatcher v. State,* 83 Wis. 2d 559, 564, 266 N.W.2d 320 (1978).

review the photos.[4] The information charged Trochinski with the same offense with a 15–year-old girl. Pursuant to a plea agreement, (1) Trochinski pleaded no contest to the one charge relating to the 17–year-old; (2) the State dismissed the count relating to the 15–year-old; and (3) the count relating to the 15–year-old was to be read into the record for purposes of sentencing.[5] At the plea hearing, the circuit court concluded, without looking at the photographs, that there was sufficient evidence to support the plea of no contest to the charge relating to the 17–year-old.[6]

¶ 39. This court concluded in *Trochinski* (1) that the circuit court could properly impliedly conclude without seeing the photos that the facts were sufficient to support the plea; and (2) that after viewing the nude photos this court could conclude as a matter of law that the facts were sufficient to support the plea. Thus, this court concluded that the circuit court had not erred.[7]

---

[4] *State v. Trochinski,* 2002 WI 56, ¶ 5, 253 Wis. 2d 38, 644 N.W.2d 891.

[5] *Id.,* ¶¶ 8–9.

[6] *Id.,* ¶ 50 (Abrahamson, C.J., dissenting).

[7] I dissented in *Trochinski,* concluding that the circuit court committed an error of law that the facts were sufficient to support the plea. *Trochinski,* 253 Wis. 2d 38, ¶¶ 51–58 (Abrahamson, C.J., dissenting) ("The complaint and Statement of Probable Cause simply state that the defendant showed photographs of himself nude to a young woman who was then seventeen years and three months of age. That's it. Not all nude photos shown to a person over the age of seventeen but below the age of eighteen violate the statute."). On reviewing the entire record, I further concluded that the facts were not sufficient to support the plea. *Id.,* ¶¶ 58–63 (Abrahamson, C.J., dissenting). I still disagree with the result in *Trochinski.*

¶ 40. The instant case involves a guilty verdict. The parts of the videotape described in the testimony were of a more offensive nature than the photos in *Trochinski* and the minors were younger than the 17–year-old who was the basis of the charge to which Trochinski pleaded no contest. In the instant case the minors were 12, 13, and 14 years old.

¶ 41. An appellate court reviews the jury verdict to determine whether the evidence was sufficient to support the verdict. When an appellate court reviews the sufficiency of the evidence in support of a jury guilty verdict, "the test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of facts could, acting reasonably, be convinced beyond reasonable doubt of such guilt from the evidence it had a right to believe and accept as true. . . . [The] evidence, when considered most favorably to the state, must be so insufficient in probative value that it can be said that no trier of facts, acting reasonably, could be convinced of the guilt of the defendant beyond reasonable doubt."[8]

¶ 42. The State argues that the video in the present case was at least as offensive as the photographs at issue in *Trochinski* and is sufficient to sustain a conviction.[9] I agree with the State.

---

[8] *State v. Richardson,* 44 Wis. 2d 75, 77, 170 N.W.2d 775 (1969). *See also State v. Poellinger,* 153 Wis. 2d 493, 507–08, 451 N.W.2d 752 (1990).

[9] The court of appeals concluded that without the whole tape, its literary, artistic, and educational value could not be ascertained. "Had the statute required only a finding that the tape contained offensive sexually explicit conduct, then perhaps the evidence would have been sufficient." *State v. Booker,* 2005 WI App 182, ¶ 34, 286 Wis. 2d 747, 704 N.W.2d 336. I do not

¶ 43. As I see it, if the defendant in *Trochinski* could not prove by clear and convincing evidence that a description of the nude photos was insufficient to satisfy the elements of the variable obscenity statute in the context of a guilty plea, the defendant in the instant case could not show that the descriptions of the video, viewed most favorably to the State, are so lacking in probative value that no reasonable trier of fact could be convinced beyond reasonable doubt that the elements of the variable obscenity statute were met.

¶ 44. Even without the *Trochinski* decision, I conclude that the evidence in the instant case was sufficient to support the guilty verdict reached by the jury.

## II

¶ 45. I also conclude that the original writing rule (Wis. Stat. ch. 910) may apply to the videotape in the instant case, though the circuit court might have reasonably concluded that there is a valid exception to the rule had it considered the issue.

¶ 46. In the instant case, the defendant did not object to the testimony regarding the videotape based on the best evidence rule. The original writing rule was not raised on appeal, but was raised by this court.[10]

¶ 47. I write to remind counsel and the bench that Wisconsin does indeed have an original writing rule, even though the rule has not appeared in any recent appellate cases.[11] For a discussion and explanation of

address the interpretation and application of the statute when only explicitly sexual material (not the whole tape) is shown to the victim.

[10] *See* majority op., ¶ 9 n.2.

[11] 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence* § 1001.1 (2006), discusses the "myth of the best evidence

chapter 910, see the Judicial Council Committee's and Federal Advisory Committee's Notes printed at 59 Wis. 2d R350–366.

¶ 48. Under Wis. Stat. § 910.02, "[t]o prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in chs. 901 to 911, s. 137.21, or by other statute." A videotape is a photograph for the purposes of chapter 910.[12]

¶ 49. The original writing rule seems applicable in the instant case because the State sought to prove the content of the videotape. That is, the State was required to prove the content of the videotape and that the content is harmful to minors as defined in Wis. Stat. § 948.11(1)(b). I need not, and do not, resolve the question of whether the voluminous records exception or any other exception to the original writing rule would have applied in the instant case. *See* Wis. Stat. § 910.06 (content of voluminous writings, recording, or photographs may be presented in summary form).

¶ 50. In sum, I write separately to expand upon the majority opinion's discussion of the *Trochinski* case

rule" and points out that neither Wisconsin nor federal law establishes a general hierarchy of evidence. Professor Blinka explains, however, that various provisions in chapter 910 of the statutes establish a rule of preference with regard to original writings, recordings, and photographs. He predicts that technological advances may create difficulties with this rule in the near future.

For further discussion of the original document rule, see 2 John W. Strong, *McCormick on Evidence* ch. 23 (5th ed. 1999).

[12] Wis. Stat. § 910.01(2) (" 'Photographs' include still photographs, X-ray films, and motion pictures."). A videotape is a form of motion picture. *See* 7 Blinka, *supra* note 11, § 1001.3. A videotape is also, presumably, a recording.

and to write about the original writing rule, a rule that may have been forgotten as we mouth the generally accepted proposition that Wisconsin does not have a "best evidence rule."