COURT OF APPEALS
DECISION
DATED AND FILED

May 1, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP524**

STATE OF WISCONSIN

Cir. Ct. No. 2023TR1025

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

COLIN R. DOWLING,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Sauk County: PATRICIA A. BARRETT, Judge. *Affirmed*.

¶1 BLANCHARD, J.[1] Colin Dowling appeals a civil forfeiture entered in the circuit court, following a bench trial, finding Dowling guilty of the traffic

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

violation of impeding traffic by operating a vehicle at a slow speed, contrary to WIS. STAT. § 346.59(1). Under this minimum-speed provision, motor vehicle operators are prohibited from driving "at a speed so slow as to impede the normal and reasonable movement of traffic," except when, as potentially relevant here, "reduced speed is necessary for safe operation" of the vehicle. Sec. 346.59(1). Dowling challenges the sufficiency of the evidence relied on by the State to prove that he violated the minimum-speed provision. I affirm.

## BACKGROUND

¶2 On a January night in 2023, a state trooper cited Dowling for two alleged violations. One was the citation for the minimum-speed violation that resulted in the order that Dowling now appeals.

¶3 The other alleged violation, not at issue in this appeal, was a criminal traffic offense. This allegation was that Dowling, after receiving from the trooper a visible signal to stop his vehicle, knowingly resisted the trooper by failing to stop as promptly as safety reasonably permitted, contrary to WIS. STAT. § 346.04(2t).

¶4 By agreement of the parties, the failure-to-stop offense was tried to a jury. Neither the facts surrounding the failure-to-stop offense nor its resolution bear on the issues in Dowling's appeal of the minimum-speed citation. At the same time, the circuit court treated the evidence adduced at the jury trial as the evidentiary basis for what amounted to a bench trial on the minimum-speed citation.

¶5 Regarding the minimum-speed citation, the circuit court made the following explicit findings in support of a finding of guilty. The trooper stopped

Dowling's electric-battery-powered Tesla sedan because Dowling was operating it "in the forties" (that is, between 40 and 49 miles per hour) on westbound Interstate 90 in Sauk County, approaching the first exit for the Wisconsin Dells. The posted speed limit on this portion of the interstate was 70. The court determined that the Tesla was traveling at "a significantly reduced speed" compared with the speeds of other westbound vehicles on this portion of I-90. These findings appeared to be based on the testimony of the trooper and the court's review of camera video taken by the trooper's squad car that showed the Tesla from behind shortly before and during the traffic stop. As a result, the court found, other vehicles passed the Tesla "at a very high rate of speed," and the Tesla's speed was "not enough to cause [other] vehicles … in the dark to get a clear understanding of how slow [the Tesla] was going [so that the other vehicles could] kind of come around" the Tesla. Consistent with these findings, in the course of addressing an evidentiary issue during the bench trial, the circuit court observed that the squad-car video reflected vehicles "whip[ping] around" or "whipping past" the Tesla while it was still in the right lane of the two lanes traveling in Dowling's direction, not yet having pulled onto the shoulder of the interstate in response to the emergency lights on the trooper's squad car.[2]

¶6     The circuit court imposed a forfeiture and costs totaling $173.50. Dowling appeals.

---

[2] In his reply brief on appeal, Dowling suggests that these comments should be ignored because the circuit court did not repeat them when it rendered its decision. But as noted below, under these circumstances appellate courts are to "'search the record to support the conclusion reached by the fact finder.'" *State v. Schulpius*, 2006 WI App 263, ¶11, 298 Wis. 2d 155, 726 N.W.2d 706 (quoted source omitted).

**DISCUSSION**

¶7      Dowling does not dispute that he was operating the Tesla at 45 miles per hour on westbound I-90 approaching the Wisconsin Dells at night, in a 70-mile-per-hour speed zone, when the trooper noticed it traveling slowly and pulled it over.  Instead, Dowling raises three alternative arguments on appeal: (1) the circuit court erroneously operated under the "apparent belief" that the minimum-speed provision may be violated when the speed of a vehicle merely has the potential to impede the movement of traffic but the vehicle does not in fact slow the progress of another vehicle; (2) here, the Tesla's speed was not, in the words of the minimum-speed provision, "so slow as to impede the normal and reasonable movement of traffic"; and (3) here, Dowling's reduced speed was, in the words of the minimum-speed provision, "necessary for safe operation" of the Tesla.[3]

¶8      The following standards apply across the three issues Dowling raises.

¶9      Statutory interpretation presents an issue of law that is reviewed de novo on appeal.  *Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611.  The application of a statute to a set of facts also presents an issue of law for de novo review.  *State v. Booker*, 2006 WI 79, ¶12, 292 Wis. 2d 43, 717 N.W.2d 676.

¶10     An appellate court reviewing a challenge to the sufficiency of the evidence to support a conviction will reverse "only if 'the evidence, viewed most

---

[3] Dowling presents these arguments in a different order from the order in which they appear in this opinion.

favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'"[4] *State v. Schulpius*, 2006 WI App 263, ¶11, 298 Wis. 2d 155, 726 N.W.2d 706 (quoted source omitted). Accordingly, "an appellate court must 'search the record to support the conclusion reached by the fact finder.'" *Id.* (quoted source omitted). These standards apply equally to jury verdicts and verdicts, such as the one challenged here, resulting from bench trials. *See id.* "'The credibility of the witnesses and the weight of the evidence is for the trier of fact.'" *State v. Poellinger*, 153 Wis. 2d 493, 504, 451 N.W.2d 752 (1990) (quoted source omitted).

¶11 Circuit court findings of fact are not disturbed unless they are clearly erroneous. WIS. STAT. § 805.17(2). It is for the circuit court, not this court, to resolve conflicts in testimony given by witnesses. *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶19, 301 Wis. 2d 752, 734 N.W.2d 169.

## I. CIRCUIT COURT'S "APPARENT BELIEF"

¶12 Dowling contends that the minimum-speed provision may not be violated when there is no evidence that the vehicle in fact slowed the progress of another vehicle. *See* WIS. STAT. § 346.59(1) ("No person shall drive a motor vehicle at a speed so slow as to impede the normal and reasonable movement of traffic …."). Dowling argues that this is dispositive because, he asserts, there was

---

[4] The State bears the burden of proving a traffic offense by clear, satisfactory, and convincing evidence, not proof beyond a reasonable doubt as in a criminal case. *See County of Waukesha v. Mueller*, 34 Wis. 2d 628, 631, 150 N.W.2d 364 (1967) (burden of proof required in forfeiture cases is clear, satisfactory, and convincing evidence). But this difference does not matter for purposes of resolving the issues in this case.

no evidence that the pace of the Tesla actually slowed another vehicle. I assume without deciding that Dowling is correct that a violation of the minimum-speed provision requires evidence that the vehicle in fact slowed another vehicle's progress. Even with that assumption, I reject Dowling's argument that the circuit court operated from the "apparent belief" that the minimum-speed provision may be violated even when there is no such evidence. The court made statements that reflected a belief that there was evidence that the Tesla in fact slowed the progress of other vehicles and such evidence is contained in the record on appeal.

¶13 Statements made by the circuit court, quoted above, establish that the court found that the Tesla in fact slowed the progress of other vehicles just before the trooper went to stop the Tesla. This finding is supported by the trooper's testimony at trial. The trooper testified that he noticed the Tesla from his stationary position at the side of I-90, when the Tesla was about five miles east and south of Lake Delton, because it was traveling at "a very slow pace." The Tesla was in the right-hand of the two west-bound lanes of the interstate and its emergency hazard lights were flashing. The trooper testified that "[o]ther vehicles were originally coming up to [the Tesla], having to swerve around [the Tesla], not knowing … how slow the [Tesla] was actually going." The trooper observed two vehicles move around the Tesla and his judgment was that the Tesla's slow speed was "causing a road hazard for other vehicles and other drivers."

¶14 Given this evidence, Dowling fails to show that the circuit court clearly erred in finding that the Tesla's pace in fact slowed the progress of another vehicle.

## II. TESLA SPEED WAS "SO SLOW AS TO IMPEDE THE NORMAL AND REASONABLE MOVEMENT OF TRAFFIC"

¶15      In an argument that overlaps significantly with the last one, Dowling contends that there was not sufficient evidence to show that the Tesla's speed was "so slow as to impede the normal and reasonable movement of traffic."  I conclude that the evidence, viewed most favorably to the State, is not so lacking in probative value and force that that no trier of fact, acting reasonably, could have found Dowling guilty of violating the minimum-speed provision.

¶16      The bulk of the arguments Dowling makes on this issue fall with my conclusion, stated above, that there was sufficient evidence to support the circuit court's finding that other vehicles were, in the words of the court, "whipping around" the Tesla.  Dowling asserts that "[t]here is no evidence" that drivers in vehicles which the trooper saw pass the Tesla "had difficulty in observing the Tesla or in timely recognizing that it was travelling at a slower speed."  But the trooper testified to the contrary: the trooper testified that "[o]ther vehicles were originally coming up to [the Tesla], having to swerve around [the Tesla], not knowing … how slow [the Tesla] was actually going."[5]

¶17      Dowling cites both Wisconsin case law and purportedly persuasive authority from other jurisdictions interpreting statutes that share features with WIS. STAT. § 346.59, but to no avail.  Putting aside potential differences between Wisconsin law and the law of other jurisdictions, the aspects of all of these opinions that are most favorable to Dowling are easily distinguishable on their

---

[5] In testimony that the circuit court apparently credited, the trooper testified that the movement of these two vehicles around the Tesla that he observed was not reflected on the squad video because the video did not start recording until after this occurred.

7

facts. One typical example is sufficient to explain the point. It does not support a viable argument for Dowling that a Tennessee court has stated that "a slow driver does not violate [TENN. CODE ANN. § 55-8-154(a) (2004), similar to the minimum-speed provision] by merely causing minor inconvenience to other motorists." *See State v. Hannah*, 259 S.W.3d 716, 722 (Ten. 2008). This does not support Dowling's argument because the circuit court here credited testimony that described the risk of a crash, not a minor inconvenience. Other cars on the road had to "whip[] around" or "swerve" into the left lane to avoid close approaches or collisions with Dowling's car. Dowling tries to argue that the court based its guilty determination on "slow speed alone," but the court determined that Dowling did more than merely drive relatively slow with no effect on other drivers.

¶18 What remains on this issue largely appears to consist of the argument that, because the Tesla consistently traveled in the right-hand of the two westbound lanes of I-90 and had its emergency hazard lights on, it could not have been operating "at a speed so slow as to impede the normal and reasonable movement of traffic." But these are merely some relevant facts that the circuit court could weigh in the totality of the circumstances. Dowling fails to show why the court was obligated to treat these two particular facts as more weighty.

### III.   "NECESSARY FOR SAFE OPERATION"

¶19 Turning to Dowling's defensive argument, he contends that his reduced speed was "necessary for safe operation" of the Tesla and therefore the circuit court should have found him not guilty. I first clarify the meaning of "necessary for safe operation" in this context. Following that is extensive additional background necessary to address this issue, and then the analysis.

### A. Statutory Interpretation

¶20 The statutes provide no definition for "necessary for safe operation." *See* WIS. STAT. §§ 340.01, 346.01(1), 346.59. Neither party in this appeal provides a satisfactory definition of this phrase in this context.

¶21 Dowling cites authority that does not shed light on this topic. The State relies on a narrow dictionary definition of "necessary" that fails to account for the entire phrase, "necessary for safe operation." The State also relies on WIS. STAT. § 939.47, which codifies the common law "necessity defense" doctrine, under which a person should not be punished for violating a law when the circumstances presented the defendant with a choice between breaking the law and enduring a greater harm. *See State v. Anthuber*, 201 Wis. 2d 512, 518, 549 N.W.2d 477 (Ct. App. 1996) (four element test: (1) defendant acted under pressure from natural physical forces; (2) defendant's act was necessary to prevent imminent public disaster, death, or great bodily harm; (3) defendant had no alternative means of preventing the harm; and (4) defendant's beliefs were reasonable). But the State does not provide a persuasive case that the legislature intended to import the necessity defense into the minimum-speed provision, and there are obvious reasons to think that the legislature did not intend this. For example, I see no reason to think that the legislature would require a person cited for a violation of the minimum-speed provision to show results as dire as imminent public disaster, death, or great bodily harm in order to establish this defense. The potential for a low-speed, relatively harmless collision or deviation from the roadway would presumably be sufficient to qualify as a need to operate safely. Such a collision or deviation might sometimes pose some risk of harm but without reaching the level of an imminent public disaster, death, or great bodily harm.

¶22    At the same time, both sides offer arguments that implicitly rely on a common-sense test.  This common-sense test might be thought of as a version of the necessity defense that is more forgiving to the accused and more attuned to the context of the minimum-speed provision.  It would ask the following question: Under all of the relevant circumstances, at the time that the operator drove at a traffic-impeding speed, did the operator have one or more reasonable alternatives to driving at that speed that presented less risk of damage or harm to any person or object?  If the answer is yes, then the defense is not available.

¶23    As he also did in the circuit court, Dowling now implicitly invites the application of this test by arguing that he had no reasonably safe alternative to driving at 45 miles per hour under the circumstances.  In a similar mode of analysis, the State contends that Dowling did have reasonable alternatives.

¶24    This test gives meaning to the entire phrase, "necessary for safe operation," consistent with what appear to be apt dictionary definitions of its individual terms.  *See* *Necessary*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/necessary) (last visited Apr. 25, 2025) ("logically unavoidable"); *Safe*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/safe) (last visited Apr. 25, 2025) ("secure from threat of danger, harm, or loss"); *Operation*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/operation) (last visited Apr. 25, 2025) ("a method or manner of functioning").  Under these definitions, the defense is available if, but only if, causing the vehicle to function at the traffic-impeding speed is logically unavoidable under the circumstances as a whole to limit the risk of danger, harm, or loss.

¶25    For all of these reasons, I apply this test in the analysis below.

### B. Additional Background

¶26    At all relevant times, Dowling was behind the wheel of the Tesla and the passengers were his wife, Allison Dowling, and their two young children.[6] The family was driving from northern Illinois to a location just off I-90 in Lake Delton. When the Dowlings left Illinois, the Tesla's battery was charged to approximately 75 percent of its capacity. The Dowlings added power at a charging station in Kenosha.

¶27    By the time they reached a charging station in Madison, the battery was charged to 11 percent of its capacity. They spent four to five minutes adding power to the battery in Madison. This brought the battery power level up to 20 percent, which the Dowlings thought would be sufficient to get them to a charging station at their destination in Lake Delton with a cushion of about 8 percent to spare. This was because the Tesla's computer assured them that they would make it from Madison to Lake Delton, with 8 percent of battery capacity to spare, taking into account factors that included how fast Dowling tended to drive, the weather, and the traffic.

¶28    After charging in Madison, the Dowlings got back on westbound I-90 at 9:12:16 p.m.[7] The Tesla reached a top speed of 84 and then traveled at a

---

[6] To distinguish between them, I will refer to the driver and defendant as Dowling and to Allison Dowling by her first and last names.

[7] Explaining the precision of the data summarized here, the circuit court was able to not only view the squad-car video referenced above, but also had available highly detailed data contained in a spreadsheet that Dowling offered at trial and testified about. Captured by Tesla's computer systems, this data covered approximately 45 minutes of the Tesla's activity that night—including time-stamped entries reflecting the Tesla's speed and the percentages of charge then purportedly held by the battery. The accuracy of the spreadsheet was not disputed by either side at trial and it is not disputed now on appeal.

sustained speed of 80, with the battery power level showing a drop to 16 percent at 9:19:26.

¶29    The Tesla's speed dropped to the mid-70s at 9:20:36. At 9:30:16, when the battery power level was down to 9 percent, the Tesla's speed was reduced to below 70 miles per hour and remained in the 60s until 9:46:06, when it dropped to 55 miles per hour. By this point, the battery power level was down to 3 percent.

¶30    The reason Dowling drove at increasingly slower speeds was that an alert on the Tesla's information screen encouraged Dowling to drive at these speeds in order to save enough power to allow the Tesla to reach the intended destination of Lake Delton, the location of the next charging station on their route. Dowling regulated his speed, using cruise control, based on all relevant indications from the Tesla; that is, he consistently drove at the specified, increasingly lower speeds. Allison Dowling testified that the Dowlings were "totally dumbfounded, shocked, [and] terrified" when they saw, after they got back onto I-90 after charging in Madison, that the Tesla was encouraging them to reduce their speed, because they had been confident after charging in Madison that they had a sufficient charge to reach Lake Delton with power to spare.

¶31    As stated above, the trooper testified that he noticed the Tesla from a position at the side of I-90 because it traveled at "a very slow pace."[8] Dowling

---

[8] Dowling notes that the trooper testified that he used a laser speed detection device to clock the Tesla at 27 miles per hour when he first noticed it on I-90, which was testimony that the defense questioned at trial. But Dowling does not develop an argument based on this testimony. I assume that the circuit court had a basis to find that the Tesla was going 45 when the trooper first saw it and then followed it, not that it was going 25. The record does not support an interpretation that the court erroneously found that the Tesla was going 27 as opposed to 45.

testified that he first noticed the trooper behind him at 9:53:26. At this point, the battery was showing 1 percent charged. The Tesla had dropped to a consistent speed of 45 miles per hour or slower for the previous 90 seconds (since 9:51:56), and it had traveled no faster than 50 miles per hour since 9:46:16.

¶32 At all relevant times, the Dowlings each had with them in the Tesla a charged cell phone that could be used to call for assistance. Both Dowling and Allison Dowling testified that, after the Tesla indicated that slower speeds were necessary in order to reach Lake Delton without another charge, they decided not to stop on the shoulder of I-90 and call for roadside assistance. This was because they believed that the battery might not continue to hold enough charge to allow the Tesla to be operated again, and because they did not know how long their headlights and flashers would continue to operate, given that the Tesla was showing the battery power level at only 1 percent. Dowling testified that he had allowed the interior cabin temperature of the Tesla to fall to 54 degrees (to conserve power) and he feared that the family would have to wait in the Tesla on the shoulder of I-90 on a winter night for "four hours or multiple hours for a tow truck that may not even be in the area." They were also concerned about the potential for delay because an inoperable Tesla must be hauled away on a flatbed truck and cannot be towed, the way many other vehicles can be.

¶33 Dowling testified that he was not aware of ice, rocks, or debris visible on the shoulder of westbound I-90 in the area where he was driving at 45 miles per hour and the squad-car video does not reflect any such obstructions. There were flurries off and on in that area that night, but there was no accumulated snow on I-90. The trooper testified that he believed that the area of westbound I-90 where he stopped the Tesla provided a safe place for the Tesla to pull onto the

shoulder. There was no construction activity and the shoulder was not covered in snow.

¶34 After the traffic stop, which lasted approximately 27 minutes, the trooper accompanied the Tesla to the Lake Delton charging station and the Tesla was able to travel this 3.2 miles without running out of power.

**C. Analysis**

¶35 I conclude that the circuit court made an implicit, reasonable determination that, under all of the relevant circumstances, Dowling had alternatives to driving so slowly and that these alternatives presented less risk of damage or harm to any person or object. The court did not explicitly address this issue, but implicit in its finding of guilt was a rejection of an argument to the contrary that Dowling made in the circuit court.

¶36 In urging an acquittal in the circuit court, Dowling argued that he faced a dilemma once the battery power level approached zero. Either he could drive at the speed essentially dictated by the Tesla and stand a good chance of making it to the next charging station, or else he could drive at a more normal speed and risk having the battery run out, forcing him to pull onto the shoulder. Dowling's argument was that if he had been forced to pull onto the shoulder and call for assistance that would have "stranded" the family, at approximately 10 p.m., in "pitch black with no street lamps/light[ing]," with "freezing temperatures outside, snow, no protective/safety gear, limited space on the shoulder of the highway, the need for a special tow, and two young children in the backseat."

14

¶37 The circuit court implicitly rejected this argument. Instead, the court gave every indication that it credited the testimony of the trooper to the effect that it would have been safe—and certainly safer than driving 45 miles per hour under the circumstances—for Dowling to pull to the side of the road and call for assistance. For that matter, I observe in support of the court's determination that when the Dowlings were alerted that the battery power level was starting to reach surprisingly low levels, they could have used one of their phones to call from the Tesla to arrange for roadside assistance while the Tesla was still fully operational. In this way, the Dowlings could have made arrangements for someone to pick them up and get them out of the cold, whether this would have been while they were pulled over or else while they were still driving at a safe speed. That is, they could have arranged for someone to pick up the Tesla either from the shoulder or from some other pull-off point, and had it towed to a charging station or, if that was not sufficient, to a service facility. To the extent that the Dowlings were "totally dumbfounded, shocked, [and] terrified" by the Tesla's indications that they should drop their speed significantly, a reasonable response would have been for them to set in motion roadside assistance, and to not wait to first run out of power or to have to stop on the shoulder.

¶38 Based on the testimony expressly and implicitly credited by the circuit court, these were alternatives open to Dowling that posed less risk of harm than driving at a large differential of speed from the flow of traffic on I-90 at night. It would have no doubt been unpleasant to make these kinds of arrangements, but the court was free to determine that this presented a safer set of alternatives under the circumstances. And the fact that a Tesla that has run out of power to operate requires a flatbed haul (as opposed to a conventional tow) is not material. The Dowlings assumed the potential for this added inconvenience when

they purchased this type of vehicle and that choice does not alter the scope of the responsibility imposed by the minimum-speed statute.

¶39 Dowling suggests that the option of "being stranded on the shoulder of a rural interstate highway on a winter night with no lights and heat" was not a reasonably safe alternative. But the circuit court had an evidentiary basis to determine that this exaggerates the actual risks that Dowling faced. For example, there is no suggestion that their cell phones would not have functioned at all relevant times, either to call for roadside assistance (to transport them either with or without the Tesla) and to call 911, assuming that a 911 call turned out to be prudent for safety reasons. Further, the concept of "no lights and heat" that Dowling raises only supports the view that the option of driving until the Tesla had zero power was not reasonable under the circumstances. There were relatively safe, reasonable alternatives to avoid this: calling promptly to arrange for roadside assistance, pulling onto the shoulder or taking an earlier exit after the problem was first identified, and not draining the battery through further operation of the Tesla on the interstate at night when there was other westbound traffic traveling at much higher speeds than 45 miles per hour.

¶40 For all of these reasons, I reject Dowling's arguments and affirm the order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.