STATE of Wisconsin, Plaintiff-Respondent,

v.

Eugene M. PERKINS, Defendant-Appellant.†

Court of Appeals

*No. 03–3296–CR. Submitted on briefs September 7, 2004.—Decided October 12, 2004.*

**2004 WI App 213**

(Also reported in 689 N.W.2d 684.)

† Petition to review denied 12-15-2005.

245

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey W. Jensen*, of Law Offices of Jeffrey W. Jensen, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. CURLEY, J. Eugene M. Perkins appeals from a judgment, entered after a jury trial, convicting him of one count of second-degree sexual assault of a mentally ill individual, in violation of WIS. STAT. § 940.225(2)(c) (2001–02).[1] Perkins contends that there is insufficient evidence to support the conviction because: (1) the State "failed to present expert testimony to establish whether the victim, H.V.[,] suffered from any mental illness or . . . deficiency to the extent that it would render her incapable [of] appraising her own behavior"; and (2) the State did not present any evidence that would "permit an inference that Perkins knew that H.V. suffered from any mental condition [that] would bring her within the protection of the statute." Because there was sufficient credible lay opinion testimony establishing that H.V. suffered from either a mental illness or incapacity under § 940.225(2)(c), thereby obviating the need for expert testimony, and because the jury could reasonably conclude from the circumstantial evidence presented that Perkins was aware of H.V.'s mental illness, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

WISCONSIN STAT. § 940.225(2)(c) proscribes "sexual contact or sexual intercourse with a person who suffers from a mental illness or deficiency which renders that person temporarily or permanently incapable of appraising the person's conduct, and the defendant knows of such condition."

247

## I. BACKGROUND.

¶ 2. In August 2001, Perkins and H.V., a seventy-eight-year-old woman, lived in the same small community-based residential facility for the elderly. At the time, there were seven patients residing in the facility; H.V. had been living there for over a year, and Perkins for about two or three months. The residents shared all of their meals at a large table, and mingled with each other all day, as the building is very small.

¶ 3. According to a witness who is a caregiver at the facility, H.V. suffers from "severe Alzheimer's," is unable to converse coherently, and does not remember things that have happened in the past or even earlier in the day. She generally responds to questions or attempts to communicate by laughing, or saying "yes ma'am" or "no ma'am." According to the witness, H.V. is not physically impaired, but does require twenty-four hour supervision because of her mental deficits.

¶ 4. Testimony established that Perkins, who was approximately sixty years old at the time, was residing in the facility after suffering three strokes. Perkins had no cognitive or mental limitations. While he was allegedly wheelchair-bound, the caregiver testified that she observed Perkins sometimes walking without the aid of his wheelchair. He also used oxygen while he slept, and occasionally during the day.

¶ 5. On August 22, 2001, H.V. and Perkins were the last two residents awake in the facility. The caregiver, who works the 5:00 p.m. to 7:00 a.m. shift, testified that Perkins was talking to H.V. in a very soft tone, referring to himself as "daddy," on and off for between two to three hours. In response, H.V. would just laugh and say "ha, ha, ha, no, no, no." At around 10:30 p.m., the caregiver put H.V. to bed and closed her

bedroom door. Perkins remained in the dining room area, watching television and talking to the caretaker, for around another hour and five minutes. At 11:35 p.m., Perkins went to bed. The caregiver ensured that he had gotten into bed and his oxygen was turned on, and then returned to the dining room.

¶ 6. According to the caregiver's testimony, at around 11:55 p.m., as she was about to start her rounds checking on the residents, she heard some noise, and went to investigate its source. From about thirty feet away, she saw H.V. "sitting in a chair in the hallway and . . . Perkins standing in front of her with his penis in his right hand and his left hand behind [H.V.'s] head forcing his penis into her mouth and H[.V.] saying 'no, no,' and she was pushing away from him." The caregiver testified that as H.V. was pushing Perkins away, he was saying "oh, come on, oh, come on." At that point, the caregiver thought she should call for a second witness, so she stopped, turned around, and went to call for assistance over the intercom. When she walked back, she heard Perkins moving at a very fast pace back to his bed. The caregiver testified that by the time she returned, she heard Perkins get into his bed, and observed H.V. still sitting in the hallway.

¶ 7. The caregiver called her supervisor and the owner of the facility, and made a bed for H.V. on the sofa so that she would be nearby. She testified that she tried to talk to H.V. about the incident, but H.V. could not remember what happened. The police were called the next day; however, H.V. was not able to respond to any questions from the officer. The caregiver gave the police an account of what happened when she returned to work the next day.

¶ 8. Perkins was charged with second-degree sexual assault of a mentally ill individual, and pled not

guilty. A jury trial was held in November 2001. At the close of the State's case, after the caregiver, the owner of the facility, and a police officer testified, Perkins moved to dismiss on the basis that there was "no evidence that [H.V.] suffers from [a] mental illness or deficiency which rendered her temporarily or permanently incapable of appraising her conduct." Perkins argued that without expert testimony regarding her condition, that element could not be satisfied. The State asserted that the law does not require a medical opinion or diagnosis and that the jury instruction specifically does not define mental illness or deficiency, for it is within the "common understanding of the jury and is not for the court to specifically define." The trial court concluded:

> It would be cleaner for me to decide if there was a doctor on the stand who had examined [H.V.] and was able to ask the direct question could [H.V.] appraise the consequences of her conduct and the import of somebody requesting to have a sexual act performed on her or by her, but the law doesn't require that evidence in order for the State to meet its burden. The State simply need prove that there was a mental deficiency and that [H.V.] was temporarily or permanently incapable of appraising her conduct.
>
> I believe that if the jury finds this evidence credible the jury can easily infer that a person who can't remember from one moment to the next what they're doing, has to be reminded to stay at the table to finish dinner and can't remember the people in her life who she deals with every day is a person who cannot appraise her conduct and does have a mental deficiency, no matter whether you put the label of Alzheimer's or dementia or anything else on it. I think this jury could easily infer from the facts that have been presented to them if the jury finds them credible that [H.V.] qualifies as a mentally ill victim under the statute.

Accordingly, I'll deny the motion to dismiss at the close of the State's evidence.

¶ 9. Thereafter, Perkins testified on his own behalf. He denied the entire incident. He claimed that he had never spoken to H.V., did not know her name, did not know why she was residing in the home, and was unable to walk in August 2001. After Perkins testified, the State recalled the owner of the facility, who testified that she had observed Perkins walking without the aid of his wheelchair prior to the day of the incident, saw Perkins talking to H.V. at least once a day during his stay, and heard Perkins call H.V. by her name.

¶ 10. At the close of evidence, Perkins again moved to dismiss, insisting that the State had failed to establish "a prima facie case with regard to the elements." The trial court denied the motion: "I still have the belief that if the jury finds the evidence credible, if they find credible what [the caregiver] said, what [the owner] said, then I think there is sufficient evidence to support a guilty verdict." The jury found Perkins guilty. He now appeals.

## II. ANALYSIS.

¶ 11. Perkins contends that "[i]n the absence of expert testimony[,] the evidence was insufficient, as a matter of law, to establish that H.V. was mentally ill or deficient to the extent that it rendered her unable to appraise her conduct." He argues that although there is no case law in Wisconsin that requires expert testimony to establish the existence of a "mental illness," as that term is used in WIS. STAT. § 940.225, "the appellate courts have consistently held that proof of 'mental illness or deficiency' as used in virtually every other section of the statutes requires proof by way of expert testimony."

251

¶ 12. Furthermore, he argues that "[e]qually absent from the record during the course of the State's case was any evidence that [he] knew whether H.V. suffered from [a] mental illness much less whether he knew that any such mental illness was sufficient to render H.V. incapable of appraising her conduct." He insists that the only evidence presented was that H.V. and Perkins resided in the same facility, and that it does not follow that he necessarily would be aware of her condition. He also asserts that "there is no reason to believe that one could discover the extent of H.V.'s impairment by a brief conversation with her[,]" which he claims is the only evidence the State presented—that he had a conversation with H.V. earlier on the day of the incident.

¶ 13. Although Perkins did move to dismiss at the close of the State's case, he also proceeded to present a defense. As such, our review concerns only whether there is sufficient evidence to sustain the conviction. *See State v. Kelley*, 107 Wis. 2d 540, 544, 319 N.W.2d 869 (1982) ("In the present case, after the defendant's motion to dismiss was denied, he proceeded to put in his defense. Therefore, on review, the appellate court must examine all the evidence in determining whether it is sufficient to sustain the conviction.").

¶ 14. Our review of the sufficiency of the evidence is limited. As the supreme court reiterated in *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990), the test is whether sufficient evidence was presented to the jury to support the finding:

> The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of

the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. . . . The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted.

*Id.* at 503–04 (citations omitted) (alterations and omissions in original). Moreover, "[o]nly when the evidence is inherently or patently incredible will [the court] substitute [its] judgment for that of the factfinder." *State v. Saunders,* 196 Wis. 2d 45, 54, 538 N.W.2d 546 (Ct. App. 1995) (citation omitted).

¶ 15. An appellate court gives deference to a trial court's findings because of "the superior opportunity of the trial court to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony." *Kleinstick v. Daleiden,* 71 Wis. 2d 432, 442, 238 N.W.2d 714 (1976). It is the jury's job to resolve any conflicts or inconsistencies in the evidence and to judge the credibility of the evidence, *State v. Pankow,* 144 Wis. 2d 23, 30–31, 422 N.W.2d 913 (Ct. App. 1988) ("The function of the jury is to decide which evidence is credible and which is not, and how conflicts in the evidence are to be resolved."), and "[i]t is certainly allowable for the jury to believe some of the testimony of one witness and some of the testimony of another witness even though their

testimony, read as a whole, may be inconsistent," *State v. Toy*, 125 Wis. 2d 216, 222, 371 N.W.2d 386 (Ct. App. 1985).

¶ 16.　Furthermore, "expert testimony is *required* only if the issue to be decided by the jury is beyond the general knowledge and experience of the average juror." *State v. Whitaker*, 167 Wis. 2d 247, 255, 481 N.W.2d 649 (Ct. App. 1992). "When the matters to be proven are within the area of common knowledge and lay comprehension, a lay opinion may suffice." *Vultaggio v. General Motors Corp.*, 145 Wis. 2d 874, 882, 429 N.W.2d 93 (Ct. App. 1988). "Generally, expert testimony will assist the jury when the issue to be decided requires an analysis that would be difficult for the ordinary person in the community." *State v. Blair*, 164 Wis. 2d 64, 75, 473 N.W.2d 566 (Ct. App. 1991). Indeed, "requiring expert testimony . . . represents an extraordinary step, one to be taken only when 'unusually complex or esoteric issues are before the jury[,]' " *Weiss v. United Fire and Casualty Co.*, 197 Wis. 2d 365, 379, 541 N.W.2d 753 (1995) (citation omitted), and "[d]etermining whether expert testimony assists the fact finder is a discretionary decision of the trial court[,]" *State v. Richardson*, 189 Wis. 2d 418, 424, 525 N.W.2d 378 (Ct. App. 1994).

¶ 17.　Here, the State had to prove four things:　(1) that Perkins had sexual contact or intercourse with H.V.; (2) that H.V. suffered from a mental illness or deficiency at the time of the sexual contact or intercourse; (3) that the mental illness or deficiency rendered H.V. temporarily or permanently incapable of appraising her conduct, or in other words, H.V. must have lacked the ability to evaluate the significance of her conduct because of her mental illness or deficiency; and (4) Perkins knew that H.V. was suffering from a

mental illness or deficiency and knew that the mental condition rendered H.V. temporarily or permanently incapable of appraising her conduct. *See* WIS JI— CRIMINAL 1211. Perkins insists that the State failed in two regards—there was insufficient evidence to establish that H.V. suffered from a mental illness and that Perkins knew of her illness. We disagree.

■

¶ 18. Perkins asserts that without expert testimony, there was insufficient evidence to establish that H.V. suffered from a mental illness. He argues that although there is no case law requiring expert testimony to prove the existence of a mental illness or deficiency under WIS. STAT. § 940.225, in general, courts have held that whether an individual is mentally ill is a medical question "that turns on the meaning of facts as interpreted by expert psychiatrists and psychologists."[2] He contends that the issue is beyond the average layman's understanding, and points to other circumstances in which expert testimony is required, such as in determining whether a defendant is competent to stand trial, proving that the defendant is not responsible for a crime due to mental disease or defect, or establishing that an individual is subject to involuntary commitment.

---

[2] In support of this contention, Perkins cites *Parham v. J.R.*, 442 U.S. 584 (1979), and *Addington v. Texas*, 441 U.S. 418 (1979). However, the former concerned a due process question arising from a statute that permitted the voluntary admission of children to mental hospitals by their parents, and the latter concerned the indefinite commitment of adults; both are thus quite distinguishable from the instant case.

¶ 19. He does not, however, point to a single statute requiring expert testimony to prove a victim's mental condition. Furthermore, he ignores the comment following the jury instruction for WIS. STAT. § 940.225, which states:

> The Committee has decided not to define "mental illness or deficiency" in the uniform instruction. Existing statutory definitions did not seem suitable because they are written in the context of determining when treatment is required or when involuntary commitment of the mentally ill person is appropriate. *For the purposes of the Sexual Assault Law, the Committee concluded that the term "mental illness or deficiency" has a meaning within the common understanding of the jury.* Additional guidance as to the type of illness or deficiency required is offered by the qualifying phrase in the statute: "...which renders that person temporarily or permanently incapable of appraising the person's conduct."

WIS JI—CRIMINAL 1211 n.1 (emphasis added). The jury is not asked to diagnose the victim's mental illness or deficiency—the State only has to prove that the victim suffered from a mental illness or deficiency that rendered the victim incapable of appraising his or her conduct.

¶ 20. Indeed, courts in other jurisdictions addressing this issue have held that expert testimony is not necessary to establish that the victim suffered from a mental illness or deficiency. For example, in *State v. Summers*, 853 P.2d 953 (Wash. Ct. App. 1993), the Washington Court of Appeals explained:

> Evidence which establishes a rape victim's inability to understand the nature and consequences of sexual intercourse is not the kind of technical evidence which requires medical testimony to decipher. Unlike evi-

dence of command delusions, or medical malpractice, or the functions of computers, a witness' comprehension · of the basic consequences of his or her actions can be proved or disproved from his or her testimony and testimony as to behavior.

*Id.* at 956. The court concluded that "[w]hile expert testimony as to a rape victim's mental incapacity may be probative, and might be required in some factual situations, there is no basis for requiring the State to establish mental incapacity by expert testimony in every case." *Id.* at 957. In that case, the victim testified. The court concluded that the victim's testimony was direct evidence of her lack of capacity, and that the jury was able to make a rational decision regarding her mental capacity without the aid of expert testimony. *See id.*

¶ 21. Moreover, when the matter to be determined is within the common understanding of the jury, lay opinion testimony may be sufficient. In light of the lack of Wisconsin precedent requiring expert testimony in cases such as this, and the lack of any statutory language defining the requisite mental illness or deficiency or requiring such testimony, we cannot conclude that expert testimony should be required in every case to establish the existence of a mental illness or deficiency rendering the victim unable to appraise his or her conduct under Wis. Stat. § 940.225(2)(c).

¶ 22. Here, the jury heard testimony from the caregiver, the owner of the facility, and a police officer as to H.V.'s behavior. The caregiver testified that she thought H.V. suffered from severe Alzheimer's. She explained that H.V. is unable to carry on coherent conversations, answers questions by laughing, or saying "no ma'am" or "yes ma'am," has to be reminded to remain at the table for meals, does not remember things that happened in the past or earlier in the day,

and needs twenty-four hour supervision because of her mental deficits. The owner of the facility testified that she believes H.V. is an Alzheimer's patient and has dementia. She also testified that H.V. is unable to carry on a coherent conversation, cannot often remember things shortly after they happen, and would not remember what she had for breakfast if asked in the middle of the morning. Furthermore, a police officer testified that H.V. could not respond to any of her questions when the officer attempted to speak with her for ten minutes.

¶ 23. This testimony as to H.V.'s behavior provided a more than adequate basis upon which the trial court could conclude that whether H.V. suffered from a mental illness or deficiency, under WIS. STAT. § 940.225(2)(c), was within the common understanding of the jury, and could be reasonably inferred from the testimony presented. The testimony established, among other things, that H.V. is unable to have coherent conversations, cannot remember events shortly after they happen, and needs assistance maintaining her daily life. A jury could reasonably conclude, based on the evidence presented, that H.V. suffered from a mental illness that rendered her incapable of appraising her conduct. Thus, we similarly conclude that there is no basis to require the State to introduce expert testimony to establish mental illness or incapacity under § 940.225(2)(c) in every case. When, as here, there is lay opinion testimony supported by ample testimony as to the victim's behavior, the existence of a mental illness or deficiency that rendered the victim temporarily or permanently incapable of appraising his or her conduct can be established without the presentation of expert testimony. As such, there was sufficient evidence pre-

sented to establish that H.V. suffered from a mental illness or deficiency.

¶ 24. Finally, Perkins contends that the only evidence presented to establish that he was aware of H.V.'s illness was that they resided in the same facility and had a brief conversation earlier in the day in question. He insists that there is no reason to believe that he would necessarily be aware of her condition as a result. Contrary to Perkins' assertions, however, that was not the only evidence presented. The jury also heard that only seven patients resided in the facility, that they ate their meals together, that Perkins interacted with H.V. on a daily basis, and that Perkins had been talking to H.V. on and off for several hours on the day of the incident. Although Perkins testified that he had never spoken to H.V. and did not know why she was residing in the facility, there was ample circumstantial evidence presented to allow the jury to reasonably draw the opposite conclusion. Indeed, "[c]ircumstantial evidence may be and often is stronger and as convincing as direct evidence." *State v. Johnson*, 11 Wis. 2d 130, 134, 104 N.W.2d 379 (1960).

¶ 25. Essentially, this boiled down to a credibility determination, and the jury chose not to believe Perkins. It is the jury's job to judge the credibility of the evidence and resolve any conflicts or inconsistencies therein. The jury could easily and reasonably conclude from the evidence presented that Perkins was aware of H.V.'s mental illness.

¶ 26. For these reasons, there was sufficient evidence to support Perkins' conviction. We affirm.

*By the Court.*—Judgment affirmed.