COURT OF APPEALS
DECISION
DATED AND FILED

March 21, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2219-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF187

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

CULLEN JOEL HORNE,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Douglas County: KELLY J. THIMM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cullen Joel Horne appeals from a judgment convicting him, following a jury trial, of third-degree sexual assault, intentionally

subjecting an individual at risk to abuse likely to cause great bodily harm, aggravated battery, and obstructing an officer. The State alleged that Horne raped an eighty-seven-year-old woman with Alzheimer's disease at a senior living facility where Horne worked as a certified nursing assistant (CNA). On appeal, Horne challenges the sufficiency of the evidence to maintain his convictions on two of the charges: intentionally subjecting an individual at risk to abuse likely to cause great bodily harm and aggravated battery. He also argues that the circuit court erred by admitting evidence detailing the specific pornography search terms found on Horne's cell phone. For the reasons that follow, we affirm Horne's convictions.

## BACKGROUND

¶2 According to the criminal complaint, on April 8, 2018, Officer Charles Mahlen of the Superior Police Department was dispatched to the emergency room for a report of a sexual assault. The victim, May,[1] reported that she had been sexually assaulted the day before by Horne, whom she knew as a "maintenance worker" at her senior living facility (the facility). May told officers that Horne gave her a back massage and then went into the bathroom and returned naked below the waist. Horne then "got on top of [May]," "'mounted' her," and used his "penis [to] penetrate [May's] vagina."

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use pseudonyms when referring to the victim and her daughter. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶3      At the time of the incident, May was eighty-seven years old and had been diagnosed with Alzheimer's disease.[2] May was accompanied to the hospital by her adult daughter, Lilly, who reported to the police and at trial that she had picked up May the previous evening to have dinner at Lilly's home. After dinner, while they were watching television together, May told Lilly about the assault. Lilly then brought May to the hospital, where she received a sexual assault nurse examination (SANE examination).

¶4      Later in the day on April 8, 2018, Officers Mark Letendre and Mahlen went to Horne's home. Horne told the officers that he had worked as a CNA at the facility, but he had resigned in January or February 2018. According to Horne, he returned to the facility on April 7 to "visit people." While there, Horne encountered May in the hall, and they went to her apartment "where they had biscuits and talked." Horne denied being romantically involved with anyone at the facility or having physical contact with anyone at the facility. However, when Letendre asked if Horne had given anyone a back rub at the facility, Horne admitted that he had given May a back rub, but he denied that anything else happened.

---

[2] May's physician, Dr. Michael Sterns, testified that Alzheimer's disease is "a progressive neurodegenerative disease that over the course of years causes significant loss in a patient's memory and their mental faculties in order to care for themselves." According to Sterns, Alzheimer's disease is a type of dementia that

> typically starts off as patients having trouble with short-term memory. Oftentimes, it can sometimes be misconstrued for some normal aging issues that are initially seen by people in the family and then, as it progresses, more behavioral characteristics are obviously evident. Inability to care for oneself, do activities of daily living in the house, take care of the finances, bathe, even communicate, at some point.

¶5 Letendre then told Horne that semen had been "recovered at the facility, and that a DNA test of it would reveal that it was from" Horne. In response, Horne informed the officers that he had taken a Cialis that day "for the purpose of having [sexual] relations with his partner later that night when he got home," but he "had gotten erect while at [May's] apartment, and went to the bathroom to 'relieve' himself." Horne explained that "he used a towel and 'probably her underwear,' referring to [May], to clean up, and that was where they would probably find his DNA." Horne continued to deny that he had sexual contact or intercourse with May. The officers placed Horne under arrest.

¶6 On April 9, 2018, while in police custody, Detective Michelle Lear interviewed Horne again. During that interview, for the first time, Horne admitted that he did have sex with May, but he claimed that it was consensual.

¶7 The State charged Horne with third-degree sexual assault, intentionally subjecting an individual at risk to abuse likely to cause great bodily harm, aggravated battery, and obstructing an officer. Pretrial, Horne moved in limine to exclude all evidence of pornography found as a result of the execution of a search warrant on Horne's cell phone. He argued that his defense was that he had consensual sex with May, not that sexual intercourse did not occur. Therefore, Horne's "sexual attraction to older women is not disputed and any attempt to use his private pornographic searches or views [is] not relevant and overly prejudicial." Horne's counsel claimed that evidence of the specific search terms Horne used was "unnecessary, salacious information."

¶8 The State argued that the pornography evidence was relevant because it went to Horne's credibility. According to the State, Horne alleged to Lear that he had a *past* pornography addiction and that he no longer looked at

4

pornography; thus, evidence that Horne had recently viewed pornography demonstrated that Horne lied to Lear and "implicate[d] credibility concerns." The circuit court agreed, observing that "the probative value is high. Obviously, there's some prejudice, but it does not outweigh the probative value, in my opinion, because it's going to credibility which is a huge factor in this case."

¶9    At trial on October 29 and October 30, 2019, the State presented testimony from Mahlen, Letendre, Lear, Dr. Sterns, SANE nurse Jennifer Baumann, Lilly, and May. May was not available to testify in person at trial—Sterns' testimony revealed that ten days previously May had suffered a "profound stroke that … left her paralyzed on the right side of her body"—but her deposition testimony was read into the record based on the parties' stipulation. *See* WIS. STAT. §§ 908.04(1)(d), 908.045(1), 967.04(5).

¶10    May testified that although she had been retired for a while, she previously taught in countries around the world, could speak multiple languages, and has a master's degree in teaching English. During her deposition, May referred to Horne as "a bad guy that came into my apartment and raped me," but she could not identify him by name. At the deposition, May was also asked to visually identify the man who came into her apartment; however, she was unable to see clearly enough to identify anyone in the room—including Horne, who was present. May stated that she had seen Horne only three times while living at the facility: the first time he was "in [her] apartment he was on his knees in front of the pull-out waste basket" and she "forgot about it and [had] no contact"; the "[s]econd time there was more contact"; and the "[t]hird time was the bad one."

¶11    On that day, May stated she heard "rustlings and things" in the living room, and then Horne came into her bedroom "naked from the waist down and

climbed onto [her] bed on his knees" and "raped [her]" by "[p]ushing his penis in and out … [of her] vagina." May could not remember whether she was under the covers when Horne entered the room or how her clothes were removed. She testified that although she did not yell or fight as she did not believe it would do any good, she did not consent to Horne putting his penis in her vagina. May explained that when it was over, Horne immediately went back into the living room, and she heard him getting dressed and leaving her apartment.

¶12    Baumann testified that May's SANE examination revealed "abrasions and some redness, particularly to her periurethral area, so vaginally, basically," "injury to and red abrasions to her labia majora as well as on her cervix," and "petechiae present on the cervix, which are small, circular red dots that indicate bleeding under the tissue." According to Baumann, May reported "tenderness" both "prior to the exam" and "with the exam." Baumann explained that based on her training and experience, May's injuries were consistent with sexual intercourse.

¶13    Horne testified in his own defense. According to Horne, he and May talked on many occasions about May's life and world travels and maintained a friendship during the time that he worked at the facility. Eventually, he explained, their relationship turned intimate. Horne testified that their first sexual encounter was in January 2018, after May invited him to her room when he offered to give May a back rub. His testimony provided a detailed account of their sexual encounter, during which he alleged he asked May multiple times "if she was okay" and she responded affirmatively.

¶14    Their next sexual encounter, according to Horne, was on April 7, 2018, when he was no longer working at the facility. Horne testified that he came

back to the facility "to see [May]" and "some other people there." According to Horne, he asked May if she would like "another back rub like the last time," and eventually they had sexual intercourse, during which Horne stated he again asked May multiple times "if everything was okay."[3] Horne denied ever using force against May or doing anything without her consent. Horne also admitted at trial that he was not forthcoming with officers about his relationship with May at first and that he "did lie."[4] He explained that he was not honest with police because his daughter and a romantic partner were present.

¶15 The jury found Horne guilty of all counts, and he was sentenced to a total of ten years' initial confinement, followed by ten years' extended supervision.[5] Horne appeals.

## DISCUSSION

¶16 On appeal, Horne challenges the sufficiency of the evidence. He claims that the evidence did not establish that he was guilty of intentional abuse of an individual at risk—Count 2—because there was no evidence that he knew that May was an individual at risk. Further, Horne argues that the evidence did not

---

[3] On cross-examination, May denied having any relationship with Horne. When questioned about Horne's versions of events, May responded by denying that the events occurred and by calling Horne a "liar" and stating that "he was making up a lot of stuff."

[4] Horne was charged with obstructing an officer based on his failure to provide honest answers to Mahlen and Letendre. On appeal, Horne explains that "he did not strongly contest" this charge at trial, and he is "not challenging" his conviction for that offense on appeal.

[5] The circuit court sentenced Horne to five years' initial confinement and five years' extended supervision on Count 1; five years' initial confinement and five years' extended supervision on Count 2, consecutive to Count 1; and three years' initial confinement and three years' extended supervision on Count 3, concurrent with Counts 1 and 2. On Count 4, the court sentenced Horne to nine months in jail, consecutive to all other counts.

establish that he was guilty of aggravated battery—Count 3—because "there was no evidence that he knew his conduct created a substantial risk of great bodily harm." Finally, Horne also argues that the circuit court erred by admitting evidence of the specific pornography search terms found on his cell phone.

## I. Sufficiency of the Evidence

¶17     Whether the evidence was sufficient to sustain a guilty verdict in a criminal prosecution is a question of law that we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. A defendant "bears a heavy burden in attempting to convince a reviewing court to set aside a jury's verdict on insufficiency of the evidence grounds." *State v. Booker*, 2006 WI 79, ¶22, 292 Wis. 2d 43, 717 N.W.2d 676. When reviewing a sufficiency of the evidence challenge, we "may not substitute [our] judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶18     "It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 506. "Thus, when faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* at 506-07. If any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the defendant guilty, then we may not overturn the jury's verdict, even if we believe the jury

8

should not have found guilt based on the evidence before it. *Id.* at 507. Notably, circumstantial evidence is sufficient to support a conviction, even on the intent element of a crime. *See* ***State v. Perkins***, 2004 WI App 213, ¶24, 277 Wis. 2d 243, 689 N.W.2d 684; *see also* ***Poellinger***, 153 Wis. 2d at 501-02.

    *a. Count 2: Wis. Stat. § 940.285(2)(a)1.*

¶19    Regarding the sufficiency of the evidence on Count 2, WIS. STAT. § 940.285 makes it a crime to "[i]ntentionally subject[] an individual at risk to abuse." *See* § 940.285(2)(a)1. An "individual at risk" is defined by statute as "any adult who has a physical or mental condition that substantially impairs his or her ability to care for his or her needs and who has experienced, is currently experiencing, or is at risk of experiencing abuse, neglect, self-neglect, or financial exploitation." Sec. 940.285(1)(am); WIS. STAT. § 55.01(1e). As the jury was informed, the intent element of the crime required that the State prove that Horne knew that May was an individual at risk. *See* WIS JI—CRIMINAL 1268 (2007).

¶20    On appeal, Horne challenges the determination that this intent element was met. He argues that the evidence was insufficient to prove that he actually knew May was "at risk." According to Horne, "[a]lthough the State presented evidence that [May] had been diagnosed with Alzheimer's disease, the common testimony from witnesses who interacted with [May] was that she was able to hold a conversation, appropriately answer questions and that the only sign of memory issues was that she repeated stories."

¶21    We conclude that the evidence was sufficient to support the jury's conclusion that Horne knew May was "at risk." May's deposition testimony clearly revealed that she had a cognitive impairment. At her deposition, May could not remember what city she lived in or her address. Further, Dr. Sterns

testified that, at the time of the sexual assault, May's Alzheimer's disease was "a mild to moderate case." He explained that when interacting with May, he noticed that her Alzheimer's disease presented as May often repeating herself. In addition, Stearns' testimony also revealed that May's physical condition placed her at risk: May had arthritis; used a walker; was being treated for macular degeneration, which caused vision problems; and was on medications for blood pressure and heart disease, including a blood thinner.

¶22 Lilly testified that while May was not receiving assisted living services from the facility,[6] she was not able to care for herself. Lilly explained that in April 2018, May could not cook, drive, or manage her finances. Lilly overwhelmingly provided care for her mother, along with another individual Lilly hired, which involved daily visits to ensure May was eating and taking her medications. According to Lilly, May would often get confused, repeat herself, and forget things. Lilly also explained that May had difficulty seeing, "walking very far without assistance," and she used a walker.

¶23 Baumann testified that during the SANE examination, which occurred "over a matter of hours," May "would repeat some things," "she talked about her profession in her life repeatedly and that she traveled repeatedly," and "she repeated what had happened earlier in that day, multiple times." Further, the testimony from Letendre and Lear also demonstrated that May's impairments were noticeable even during short conversations. For example, Letendre testified that

---

[6] Residents at May's facility received different levels of care. Some residents would receive nursing and living assistance from the staff, such as help with medications and personal care, while other residents, like May, were considered "independent living" and did not receive assistance from staff.

he spoke with May for "[a]pproximately a half hour" and noticed that she was repetitive in her answers, which he explained, based on his "training and experience, … was consistent with what [he] know[s] of that disease process," meaning Alzheimer's disease. Lear also testified that she met with May two times, and it was "clear to [her] that [May] had limitations as far as remembering things and repeating things."

¶24   Horne's own testimony also provides support for the jury's verdict. It is clear, based on the record, that Horne knew May's age, he knew that "she walk[ed] slow," that "she fell one time," and that she used a walker. He stated, however, that he did not know of her Alzheimer's diagnosis. According to Horne, he had many conversations with May; yet, he testified that he never recognized any general signs of dementia in May, only that she "told a lot of the same stories," but he asserted that he repeats himself as well. Horne also testified, however, that as a licensed CNA, he had completed five weeks of training, which included instruction on recognizing general behaviors of people with dementia.

¶25   On appeal, Horne focuses on the fact that he was not specifically trained to *diagnose* Alzheimer's disease and that he did not have access to May's medical records. He also argues that the State "relies on evidence of [May's] physical and mental health from witnesses who were privy to that information …. What is missing is any evidence that Mr. Horne knew any of these facts on the date in question."

¶26   As the State recognizes, however, "Horne fails to appreciate that circumstantial evidence is all you need to prove intent." *See Perkins*, 277 Wis. 2d 243, ¶24. In *Perkins*, the issue was whether the state presented sufficient evidence to permit an inference that Perkins knew that the seventy-eight-year-old victim of

a sexual assault was suffering either from a mental illness or incapacity. *Id.*, ¶1. This court concluded that under the facts of that case, "there was ample circumstantial evidence presented to allow the jury to reasonably draw the" conclusion that Perkins was aware of the victim's mental illness, despite Perkins' assertion that he had not spoken to the victim and did not know why she was living in the residential facility for the elderly. *Id.*, ¶¶24-25. While we acknowledge, as Horne argues, that there are significant factual differences between *Perkins* and this case, the point is that we accepted the inference the jury made based on circumstantial evidence, explaining that the case "boiled down to a credibility determination, and the jury chose not to believe Perkins." *Id.*, ¶25.

¶27     Here, too, given Horne's testimony that he had multiple interactions with May over time and prior to the assault, and given his training as a CNA, the jury could reasonably infer that Horne would know that May had memory issues and was suffering from cognitive impairment—in addition to her physical issues—and was therefore an adult at risk. The fact that May had some mental limitations was clear to both Baumann and law enforcement officers with much less contact with May than Horne stated he had. The jury was not required to accept Horne's testimony that he did not know about May's cognitive impairment. We therefore conclude the State presented sufficient evidence for the jury to find that Horne knew that May was an individual at risk for purposes of WIS. STAT. § 940.285(2)(a)1.

   *b.  Count 3: WIS. STAT. § 904.19(6)*

¶28     Horne was also convicted of aggravated battery pursuant to WIS. STAT. § 940.19(6) (2017-18), which prohibited "intentionally caus[ing] bodily harm to another by conduct that creates a substantial risk of great bodily harm."

To prove battery with substantial risk of great bodily harm, the State was required to show that Horne: (1) caused bodily harm to May; (2) intended to cause bodily harm; (3) created a substantial risk of great bodily harm; and (4) knew his conduct created a substantial risk of great bodily harm. *See* WIS JI—CRIMINAL 1226 (2015). The definition provided to the jury for "[g]reat bodily harm" was "serious bodily injury."[7] *See id.* The jury was instructed that at the time of this case, § 940.19(6) (2017-18) contained a rebuttable presumption that "conduct creating a substantial risk of great bodily harm arises" "[i]f the person harmed is 62 years of age or older." Sec. 940.19(6)(a).[8] Thus, as Horne concedes, because May was eighty-seven years old, it is presumed that Horne's conduct created a substantial risk of great bodily harm.

¶29    On appeal, Horne argues that "the State was required to prove that Mr. Horne both intended to cause harm to [May] *and* knew that his conduct created a substantial risk of great bodily harm," and he claims that the evidence was insufficient to establish either element. While Horne admits that May had significant health problems, he asserts "there was no evidence at trial that Mr. Horne was aware of anything other than her age and that [May] had fallen once in the hallway" such that he would have "the requisite intent and knowledge that his conduct created a substantial risk of great bodily harm."

---

[7] During deliberations, the jury asked the circuit court: "Is there more of a definition of great bodily harm than just meaning serious bodily injury? Is there a definition for serious bodily injury?" In response, and upon agreement of the parties, the court provided the jury with the definition of "great bodily harm" found in WIS. STAT. § 939.22(14) (2017-18): "'Great bodily harm' means bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury."

[8] WISCONSIN STAT. § 940.19(6)(a) (2017-18) was later repealed by 2021 Wis. Act 76, § 29.

¶30     All that is required to uphold this conviction is credible evidence that Horne knew his conduct created a substantial risk of great bodily harm. *See* Wɪs JI—Cʀɪᴍɪɴᴀʟ 1226 (2015). Again, Horne does not acknowledge that circumstantial evidence presented to the jury may provide support for the jury's verdict. *See **Perkins***, 277 Wis. 2d 243, ¶24. While Horne continues to maintain that his conduct was consensual, he "acknowledges that on appeal this court views the evidence in the light most favorable to the State and the conviction," meaning that we consider Horne's arguments from the posture that a sexual assault occurred.

¶31     We conclude that the evidence presented at trial provided a basis for the jury to infer that Horne knew his conduct created a substantial risk of great bodily harm to May. As noted above, Horne knew May's age, the fact that she used a walker, and that she had fallen at least once in the past. Testimony revealed that May was on blood thinners and heart medication. As the State argues, while Horne might not have known the exact medications May was taking, it was reasonable based on his training as a CNA and his work at the facility that he would have been aware of the likelihood that a woman of her age was at risk for strokes and heart attacks. It suspends credulity to suggest that anyone would not be aware that raping an eighty-seven-year-old woman created a substantial risk of great bodily harm. Even Horne's own testimony revealed that he repeatedly asked if May was all right during the sexual intercourse, which is a further indication that Horne was concerned he could be or was hurting her. The issue is whether Horne understood that his conduct created a substantial risk of great bodily harm, and the jury was not required to—and, in fact, did not—believe Horne.

¶32     Horne also argues that the evidence was insufficient because May did not actually suffer great bodily harm; however, that is not the standard under

the statute. All that is required is that Horne "intended to cause bodily harm to" May. *See* WIS JI—CRIMINAL 1226 (2015). Horne acknowledges that his intentional conduct—sexually assaulting May—caused her bodily harm.

¶33 Baumann testified that May suffered some abrasions and injury on her vaginal area; that there were petechiae—indicating bleeding under the tissue—on her cervix; and that May reported tenderness prior to and during the SANE examination. Baumann then testified that these findings could be consistent with both sexual assault and with consensual sexual activity. On cross-examination, the prosecutor asked Horne whether he heard Baumann's testimony about "multiple injuries." Horne responded, "I didn't hear … anything about multiple injuries…. Sounded like they were just talking about normal things that happened during sex." We agree with the State's argument that this comment demonstrated Horne's acknowledgement of the risk of harm to May from sexual intercourse and that bodily harm to May was a likely outcome. Further, as discussed above, given May's fragile condition, a reasonable jury could conclude that Horne was aware of the risk his conduct posed, and, thus, could infer that he intended to cause bodily harm based on his intentional conduct.

## II. Pornography Evidence

¶34 Finally, Horne argues that the "circuit court erred by admitting evidence detailing the specific pornography search terms found on Mr. Horne's cell phone, as this evidence was not relevant to Mr. Horne's credibility and was

15

highly prejudicial."[9]  (Formatting altered.)  At trial, Lear testified that forensic data from Horne's cell phone revealed "a number of searches for pornography sites and even more searches … referencing elderly pornography sites." According to Lear, these search terms included "80 Plus, Cream Pie Granny, Fuck, Cum.  I know that was one specific one.  There was another 76-year old—like skinny granny something.  A lot of … the use of the word 'granny' and 80-plus were in a lot of them."  Lear told the jury that most of the searches were between February 5, 2018, and March 27, 2018.  The prosecutor then asked Lear "why was this significant in your investigation," and Lear responded, "Because Mr. Horne had told me that he was over his porn addiction and had not looked at it, I think he said in a couple years.  And it was also relevant because [May] is 87 years old—or was at the time."[10]

¶35    We follow well-settled guidelines in our review of a circuit court's discretionary decision to admit or exclude evidence.  "To be admissible at trial, evidence must be relevant."  ***State v. Petrovic***, 224 Wis. 2d 477, 493, 592 N.W.2d 238 (Ct. App. 1999); *see also* WIS. STAT. § 904.02.  "Relevant evidence" is

---

[9] We note first that the State argues that Horne has forfeited this argument.  The State explains that what Horne appears to be arguing on appeal is that Lear's testimony "went beyond the scope of what the [circuit] court allowed," and Horne failed to object to this testimony at trial.  In response, Horne argues that his motion in limine "preserved his objection to this evidence," and, in the alternative, we should address his claim because "the State had a full and fair opportunity to respond."  For the sake of finality, we will address Horne's claim.  *See **State v. Erickson***, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999) ("[T]he [forfeiture] rule is one of judicial administration and ... appellate courts have authority to ignore the [forfeiture].").

[10] During his interview with Lear, Horne suggested that his past pornography addiction was the reason he was not able to turn down May's sexual advances toward him.  Horne explained, "I'm sure that my past pornography addiction, it … probably added to the problem.  I stopped it a while ago.  I haven't even messed with it.  But I'm sure it took its toll on my brain."  He went on to explain that "[i]t has been tough for [him] to put [pornography] down, but that's a really great success in the last couple years of—of, uh, just really putting it aside.  Actually, more than a couple years 'cause the … worst time I had with it was years ago."

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. Relevant evidence is generally admissible, *see* § 904.02; however, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," WIS. STAT. § 904.03. "The admission of evidence is subject to the circuit court's discretion." *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. This court "will not disturb the circuit court's decision to admit evidence unless the court erroneously exercised its discretion." *Id.*

¶36 We conclude that the circuit court did not err by allowing testimony regarding the pornographic searches on Horne's cell phone, including the specific search terms. The record demonstrates that the circuit court found Lear's testimony to be highly relevant and probative because it impeached Horne's credibility by revealing that Horne had lied during the investigation. As noted, Horne told Lear that he had stopped viewing pornography years prior to the assault. Further, during cross-examination at trial, Horne acknowledged his search history included pornography with mature women. He testified, however, that he was not "highly sexually stimulated by elderly women," generally. Instead, he was attracted to May, specifically.

¶37 Given that Horne testified at trial, his credibility was very relevant to the State's case. *See State v. Sonnenberg*, 117 Wis. 2d 159, 183, 344 N.W.2d 95 (1984) (Callow, J., concurring) ("Because the defendant's credibility is an important issue when he testifies that he did not commit an offense, evidence of his credibility is important to a determination of the truth."). Lear's testimony,

including the names of the websites and search terms, salacious or not, was very relevant to question the truthfulness of Horne's statements to police and his testimony at trial.

¶38  Further, we agree with the circuit court that the pornography evidence was certainly prejudicial to Horne, but it was not unfairly so.  Evidence is unfairly prejudicial "if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case."  *State v. Davidson*, 2000 WI 91, ¶73, 236 Wis. 2d 537, 613 N.W.2d 606 (citation omitted).  There was no danger of the jury finding Horne guilty of the charged offenses simply because the jury was disturbed by the type of pornography he viewed.  Horne was charged with raping an eighty-seven-year-old woman with Alzheimer's disease.  "Thus, it is unlikely that the jury would punish [Horne] for the pornography rather than for the conduct he was charged with."  *See State v. Normington*, 2008 WI App 8, ¶35, 306 Wis. 2d 727, 744 N.W.2d 867 (2007) (citing *State v. Volk*, 2002 WI App 274, ¶24, 258 Wis. 2d 584, 654 N.W.2d 24). The circuit court did not err by admitting the pornography evidence.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

18